2015 IL App (1st) 130657

No. 1-13-0657

Fifth Division
August 14, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 11 CR 14714 |
| v. | ) ) | The Honorable |
| HERBERT BURGESS, | ) ) | Ellen B. Mandeltort, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1      After a jury trial, defendant Herbert Burgess was found guilty of aggravated criminal sexual assault, criminal sexual assault, and unlawful restraint. 720 ILCS 5/11-1.30(a)(4), 11-1.20(a)(4), 10-3 (West 2010). After hearing arguments in mitigation and aggravation, defendant was sentenced to 24 years with the Illinois Department of Corrections (IDOC) for aggravated criminal sexual assault, 15 years for criminal sexual assault, and 3 years for unlawful restraint. All sentences were to run concurrently.

¶ 2　　　　On this direct appeal, defendant claims that: (1) he was denied the ability to present a complete defense; (2) the trial court's prejudice denied him a fair trial; (3) prosecutorial misconduct denied him a fair trial; (4) the trial court erred in allowing the State to rehabilitate witnesses with prior consistent statements; (5) the trial court considered improper aggravating factors during sentencing; (6) defendant's aggravated criminal sexual assault conviction was the result of a double enhancement; and (7) the trial court erred in not vacating the conviction for criminal sexual assault, as it resulted from the same act as the conviction for aggravated criminal sexual assault.

¶ 3　　　　For the following reasons, we find convincing only defendant's seventh claim, that the aggravated criminal sexual assault and criminal sexual assault resulted from the same act, and therefore vacate the conviction for criminal sexual assault. We affirm, and correct the mittimus to reflect only convictions for aggravated criminal sexual assault and unlawful restraint.

¶ 4　　　　　　　　　　　　　　　BACKGROUND

¶ 5　　　　We provide a detailed version of the testimony in full below, but in sum, the State's evidence established that on August 8, 2011, the victim, age 15, hereinafter referred to as "the minor," was a male summer employee working for defendant's employer. Defendant worked for this company as a human resources director. Defendant was driving the minor home when they stopped at defendant's apartment. The minor tried to leave the apartment and defendant slammed the door and locked it, preventing him from leaving. Defendant then sexually assaulted the minor and ejaculated onto the minor's shirt. A few days later, defendant allegedly sexually assaulted the minor again, this time at defendant's workplace, which is located in Lake County. This alleged assault is the subject of a separate criminal

case in Lake County. The minor told his parents about the sexual assaults and defendant was ultimately arrested and charged. During trial, defendant maintained that the minor's father had stolen a T-shirt, which defendant had previously masturbated into, and then coerced the minor into bringing false claims in order to extort defendant and defendant's employer. The minor's family had made a monetary demand to the company that defendant worked for in response to the alleged assault that took place at the company, which was settled out of court.

¶ 6        Defendant cites over 100 interactions that he claims show prosecutorial misconduct, comments from the trial court showing bias, and other judicial errors. It would be overly burdensome to list all of these in full, but we provide examples of the general type of interactions to which defendant objects in our analysis.[1] To preserve anonymity, we refer to the individual, whom defendant allegedly sexually assaulted in this case, only as "the minor." The minor's relatives are referred to by their familial connection to the minor, such as "the father" or "the uncle." This is done because the initials of the family members could be used to identify the victim, if viewed by someone familiar with the family.

¶ 7                             I. Pretrial Motions

¶ 8              A. State's Motion to Use Proof of Other Crimes

¶ 9        On September 4, 2012, the State filed a motion to use proof of other crimes as evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2010)). At the hearing on September 20, 2012, the court heard the State's motion. Through the motion, the State sought to introduce evidence that defendant had previously inappropriately touched the minor, made sexually suggestive remarks to the minor, sexually assaulted the minor (for which a Lake County criminal case was ongoing,)

---

[1] We note that in our analysis, we have considered all the comments cited by defendant in support of his claims on appeal, even if not expressly set forth here.

and sexually assaulted another underaged individual, M.M. Defense counsel objected, arguing that the incident alleged by M.M. was factually different from the case at bar. Defense counsel also argued that the minor's father had conspired against defendant to frame him for sexual assault, and, therefore, the previous alleged inappropriate remarks and touches were inadmissible. Finally, defense counsel argued that introduction of this evidence would be prejudicial against defendant.

¶ 10 The trial court granted the State's motion in part and denied it in part. The trial court found that, for the evidence involving incidents involving the minor, the proximity in time and degree of factual similarity satisfied section 115-7.3 of the Code of Criminal Procedure (725 ILCS 5/115-7.3 (West 2010)). For this same evidence, the trial court also stated that it had weighed the probative value of the evidence against any undue prejudice it may cause defendant. Therefore, the trial court found that the State could introduce evidence from the sexual assault that defendant was charged with committing against the same minor in Lake County. However, using the same analysis, the trial court barred the State from introducing evidence involving the alleged sexual assault by defendant against M.M.

¶ 11 B. State's Motion *In Limine*

¶ 12 On December 10, 2012, the State filed a motion *in limine*, seeking to bar defense counsel from introducing during *voir dire*, trial, and in opening and closing statements, any hearsay evidence that defense counsel might try to elicit through the testimony of the minor's uncle. In the motion, the State claimed that the uncle would allegedly present testimony that: (1) the minor received a T-shirt stained with defendant's ejaculate from his father's girlfriend's brother; (2) the minor's father had told the minor to "act gay" around defendant; (3) the minor's father had told the minor, while driving him to the hospital, to place the

4

minor's finger in the minor's own anus; (4) the minor's father had blackmailed defendant at a previous time by coaxing defendant into inebriation and taking nude photographs of defendant with an unnamed individual; (5) the minor's father had blackmailed defendant at some other unidentified time for an unidentified reason; (6) the minor's father had threatened the minor's uncle's life; and (7) the minor's father had a past history of fraud and possession of firearms. In the motion, the State claimed these allegations from the minor's uncle were uncorroborated hearsay.

¶ 13    On the same day, the trial court held a hearing on this motion. In regards to the T-shirt, the trial court asked defense counsel, "you are maintaining that [the uncle] had a conversation with [the father] in which [the father] said that [the T-shirt] came from an encounter with an unidentified brother of the father's girlfriend?" Defense counsel replied affirmatively, and the trial court stated that this testimony sounded like "double, triple hearsay." However, the trial court held that it would allow defense counsel to submit an offer of proof. In regards to the uncle testifying that the father had a history of fraudulent behavior, the trial court held that it would allow the reputation testimony, assuming a proper foundation was laid at trial. Defense counsel was unable to recall the specific details of how the uncle learned the information included in the other allegations, and the trial court gave defense counsel leave to "get some more specifics" regarding the allegations.

¶ 14    On December 11, 2012, the trial court reconvened to hear arguments on the State's motion *in limine*. Defense counsel made an offer of proof regarding the testimony that the uncle was prepared to give. The offer of proof listed a number of allegations that the uncle had heard the father discussing the case as a means to frame defendant. The offer of proof never stated that the uncle heard the father pressuring the minor to continue with his

5

allegations, but it does state that "[t]hroughout his stay with his family, [the uncle] observed [the father] berate and yell at [the minor] repeatedly and that in [the uncle's] lay opinion, [the father] plays 'mind games' with [the minor]." The court stated "[p]resumably the statements of the uncle are being offered by you to impeach the [minor's] father." However, because no offer of proof was made as to what the father would testify to, the court held that it could not yet rule on whether the uncle would be allowed to rebut it. The court did find that if the father denied having these specific conversations with the uncle, then the uncle's testimony could be allowed to impeach the father as to what the father said, but that this would not be considered substantive evidence.

¶ 15          Defendant also made an offer of proof that the uncle overheard the minor telling the father that the minor did not want to lie anymore. Defense counsel stated that he did want to be able to ask the minor if he had told his father that he did not want to lie anymore. The trial court responded, "*** if [the minor] is on the stand *** ask him whether he told his uncle he didn't want to lie anymore, and if he denies it, then the uncle can certainly say that's what [the minor] told me." The State responded that the offer of proof did not contain a time or date when the conversation occurred. The court reminded defense counsel that a proper foundation for introducing the uncle's testimony would need to be laid.

¶ 16          Defense counsel then stated that he wanted to introduce during opening statements, and at trial, that a monetary demand was made by the minor's parents to defendant's employer, who had also been employing the minor for the summer, that was based on defendant allegedly sexually assaulting the minor in the workplace. The State responded by arguing that the demand was in regards to a separate sexual assault that had taken place at the Lake County workplace, and did not involve any facts from the case at bar. Defense counsel

argued that the case was already being allowed in through the State. The trial court noted that it was being let in, but only as proof of other crimes. The trial court then stated:

"THE COURT: What I suggest, counsel, we're going to get to opening statements. Be careful what you argue in terms of that lawsuit. I will certainly allow you to brief this for this court and I will reconsider but at this time you may not reference that settlement between the company and the victim's family for an offense that did not occur [in this case] and that's not the subject of this case.

\*\*\*

THE COURT: Counsel, until you cite me some cases that you give me or something to show why it's coming in, you may not reference a settlement in an unrelated case."

¶ 17    The trial court held that it would reconsider the introduction of the civil case related to the Lake County criminal case once defense counsel briefed the court with relevant legal precedent.

¶ 18                              II. Jury Selection

¶ 19    During *voir dire*, two potential jurors stated that they were uncomfortable with the charges against defendant. One in particular noted that the charges "made the hairs" stand up on his neck. The trial court rehabilitated both potential jurors, who stated that they could follow the law as given to them by the trial court. After rehabilitating one of the jurors, the following exchange occurred:

"DEFENSE COUNSEL: Well, [juror], you still seem a little unsure about that.

THE STATE: Objection, Judge.

THE COURT: Sustained, counsel. He's answered the question. He said he could be a fair juror. It is not for you to comment, sir."

¶ 20                                    III. Opening Statements

¶ 21        During opening statements, defense counsel stated that over the course of the trial, he would show that the father had fabricated the evidence against defendant. Defense counsel stated that defendant and the father had been friends for 10 years and were going into business together. Defendant gave the father $20,000 to start that business, at which point the father pressured the minor to bring sexual assault allegations against defendant in order to keep the money. The father also found the semen-stained T-shirt, while at defendant's house, and planted it as evidence. Defense counsel then stated that, by the end of the trial, the jury would ask themselves, "Do I have a single piece of evidence in this case that did not go through [the father]? No."

¶ 22        IV. Rehearing on Defense's Motion to Introduce the Civil Case

¶ 23        Later on the same day, after opening statements, defense counsel presented the court with several cases regarding the introduction of the monetary demand of defendant's employer, as well as a letter showing that a demand had been made. The letter was from a law firm, directed to defendant's employer, stating that the minor's parents had retained the firm for an impending lawsuit against the employer. Defense counsel also produced a letter from the same law firm stating that it had been retained to represent the minor. This letter made no mention of what individual(s) had retained the law firm to represent the minor. The trial court made the following findings:

"THE COURT: In your opening statement to the jury, all the evidence went through [the father], the T-shirt went through [the father], the T-shirt came from [the

father], every allegation will come from [the father]. That dad controlled [the minor], put him up to this.

That is what you have stood in front of this jury and said and that is what you have said to this court on more than one occasion. You will not be allowed to cross examine [the minor], the complainant in this case about this civil action. If and when the father testifies, we will again address that issue, and if it becomes ripened at a later date as to [the minor], I will allow him to be recalled as a witness.

But I don't believe based on the records you have made, based on the documents I've been tendered, based on what I have been told, that it is a proper area of cross examination of a 15 year old victim of a sexual assault that his family on his behalf filed some sort of action against the company for a sexual assault that is pending in Lake County."

¶ 24                                V. Evidence at Trial

¶ 25                                A. The State's Case

¶ 26        The State's case consisted of 11 witnesses: (1) the minor; (2) Heather Evanoka, defendant's next-door neighbor; (3) detective Lee Schaps, who investigated the case; (4) Officer Michael Wood, a patrol officer and evidence technician; (5) Officer David Okon, an evidence technician; (6) detective Johnathan Juhl, who collected DNA samples from the minor and his father; (7) Ronald Tomek, a forensic scientist; (8) Andrew Garinger, a forensic scientist; (9) William Abruscato, defendant's former cell mate; (10) Douglas Zeit, Abruscato's attorney; and (11) a Lake County assistant State's Attorney (ASA), who prosecuted Abruscato, and also prosecuted the defendant in the case at bar in the Lake County criminal case.

¶ 27                                1. The Minor

¶ 28         The minor testified that he was currently living with his father, and that starting in early July 2011, at the age of 15, he began working for defendant at defendant's workplace, where his mother was also employed. Defendant was also the boss of the minor's mother. The minor had known defendant for many years. There was another employee who was the same age as the minor, M.M., who was also working at the workplace for the summer. The minor and M.M. worked in the back of the workplace, and defendant would come to the back to check up on them six to seven times a day. During these "check-ups," defendant would buy the minor Gatorades, put his arms around the minor's shoulders, and slap the minor's behind. Defendant would refer to the minor and M.M. as "his boys." Defendant would also purchase lunch for the minor and M.M. and have them eat the lunch in his office. Defendant would ask the minor to accompany him on smoke breaks, during which defendant would stare at the minor's crotch.

¶ 29         The minor testified that, on July 26, 2011, defendant drove the minor and M.M. to a gym after work. On the way to the gym, defendant stopped at a retail store, where he bought a bathing suit for M.M. and some tank tops and socks for the minor. At the gym, defendant asked the minor and M.M. to come to the pool with him. The minor and M.M. wanted to lift weights first, at which point defendant became angry; his face turned red and he stuck out his tongue and bit it. After the minor and M.M. lifted weights and went swimming, they returned to the locker room to shower and change. While the minor and M.M. were showering, defendant peered over the curtain and stared at M.M. He then pulled the curtain of the shower aside to ask the minor if he needed soap, to which the minor replied that the gym provided soap. When the minor was changing after showering, defendant asked him how his

"python" was doing. Defendant told the minor that he had seen the minor's "python," because he looked at it while the minor was in the shower. Defendant bought the minor and M.M. dinner and drove M.M. home. While driving the minor home, defendant stopped at another retail store and picked out some shirts, deodorant, and body spray to purchase for the minor. Defendant then asked the minor if he needed any condoms. The minor told defendant that he did not want any condoms, but defendant put a large box of condoms in the cart and told the minor that he was buying them for the minor. While purchasing the items, defendant asked the minor if the minor was going to use the condoms with him. Defendant then drove the minor home.

¶ 30    The minor testified that, after this incident, defendant began "checking-up" on the minor 10 to 12 times a day. Defendant would ask the minor how his "six-pack" was doing, and on one occasion asked the minor to show him his "six-pack." When the minor refused, defendant grabbed the minor's shirt and pulled it up to show the minor's stomach. Defendant also told the minor's father that he would begin driving the minor to work, and subsequently began driving the minor to and from their workplace. During these trips, defendant would touch the minor's thigh and on one trip touched the tip of the minor's penis. On one occasion, when defendant was driving the minor home from work, defendant stopped and bought the minor a Playstation 3 with six video games.

¶ 31    The minor testified that, on August 8, 2011, defendant, the minor, and his father[2] planned to have a barbecue after defendant and the minor finished their work day. After work, defendant drove the minor to defendant's apartment in Cook County, where defendant said he had some groceries to pick up for the barbecue. Defendant told the minor that he had

---

[2] The minor's parents were separated, and the minor would live with each of them for varying periods of time, at the minor's discretion.

to come into the apartment, otherwise defendant would be in trouble. Inside the apartment, defendant told the minor that he had purchased the minor a black jockstrap and a white jockstrap so that the minor did not hurt himself while lifting weights. Defendant asked the minor to try them on, and the minor refused. Defendant then turned red in the face, stuck his tongue out, and bit it. The minor opened the door to the apartment and asked to leave. Defendant pushed the minor onto the couch and slammed the door, at which point the minor heard something breaking. Defendant then locked the door. Defendant grabbed the minor, forced him into the bathroom, and told the minor that he had to try the jockstrap on in front of defendant. The minor took off his pants and underwear and put on the jockstrap. He was also wearing a white T-shirt. Defendant then pushed the minor into the bedroom, where defendant fondled the minor's buttocks. Defendant pushed the minor facedown onto the bed, opened the drawer of the desk that was next to the bed, and the minor then felt a cold liquid on his buttocks. Defendant then used his penis to anally penetrate the minor while holding the minor facedown on the bed. The minor felt pain and after about five minutes "felt something wet" on the back of his shirt. The minor ran to the bathroom, closed the door, and dressed, leaving the jockstrap on the bathroom floor. The minor was crying when he left the bathroom, and defendant told the minor that if he ever said anything, the minor's mother would lose her job and the minor would be living on the street. Defendant also told the minor that no one would believe him because "[defendant was] a man who wears a shirt and tie." After defendant brought the minor home, the minor ran upstairs and would not talk to his father. The minor testified that he did not tell his father about the incident because the minor was afraid no one would believe him and that the minor knew his father had a "rough past" and "didn't want [his father] to go to jail for killing somebody." The minor took an hour-long

shower and, upon leaving the shower, noticed that his T-shirt had a yellow stain on it. He placed the T-shirt in a plastic bag and hid the bag in his closet. The minor testified that he did this because he had learned about DNA evidence in school, he knew defendant's semen was on the shirt, and he was scared by defendant's claim that no one would believe the minor about what happened. The minor continued to receive rides from defendant to and from work for the next several days, because he was scared that if he refused the rides his father would become suspicious.

¶ 32 The minor testified that, on August 12, 2011, at their workplace, defendant asked the minor to accompany him while he locked up the workplace for the night. When they had reached the back of the work area, defendant held the minor's hands behind his back with one hand, and with the other hand pulled the minor's pants down and began pulling on the minor's penis and pubic hair. Defendant also inserted his fingers into the minor's anus. Defendant again told the minor that if he told anyone his mother would lose her job.

¶ 33 The minor testified that, on August 15, 2011, he told M.M. that defendant had sexually assaulted him. On that day, the minor also received a text message from defendant at 6:12 p.m. The text message read: "If I find out you said something, you'll be living on the street." The minor knew the text message was from defendant because defendant had given the minor his number so that defendant could coordinate picking up the minor for work. The minor was let go from employment on August 16, 2011.

¶ 34 The minor testified that, on August 19, 2011, his father drove him to a police station, where the minor told detectives of the sexual assault. Detectives at that time took a picture of the minor's cellphone showing the text message from defendant. The minor's mother and a

police officer[3] drove him to a hospital to be examined. After the hospital, a police officer met the minor at his father's house, and the minor pointed the officer to the plastic bag containing the T-shirt that the minor was wearing when he was sexually assaulted by defendant. The minor then identified at the trial the T-shirt he wore during the incident, the jockstrap he was forced to wear, a photograph of the cracked door at defendant's apartment, and a picture of the text message sent from defendant to the minor. These were later admitted into evidence without objection.

¶ 35       During cross-examination, the minor testified that he had not made any phone calls to defendant after August 8, 2011. The minor testified that, on August 8, 2011, he worked nine hours. The minor testified that he never told Detective Michelle Kondrat about the incident where defendant pulled the minor's shirt up while in defendant's office. He also testified that he did not ask defendant to purchase him a Playstation 3. The minor testified that he and his father had been to defendant's house three to four times for dinner.

¶ 36       Later, the following exchange occurred:

"DEFENSE COUNSEL: Where were you staying in the spring of 2012?

THE STATE: Objection. Asked and answered.

DEFENSE COUNSEL: The spring the [*sic*] 2012, [the State]?

MINOR: What months are you talking about?

THE COURT: Hang on one second, counsel.

State, what's your objections?

THE STATE: Judge, I'm sorry that's 2012. Relevance.

THE COURT: Okay. Counsel?

---

[3] The minor did not testify as to the names of the police officers involved.

DEFENSE COUNSEL: I think I'm headed towards some of the prior issues we talked about, Judge.

***

(Heard outside the presence of the jury)

***

THE COURT: You want to ask the victim if his father made him bring these allegations?

DEFENSE COUNSEL: I want to ask an alleged witness whether anyone's influencing him. I want to ask—that's what I want to ask. I want to ask a witness whether or not anybody's encouraging him in any way. It is the wheelhouse of cross examination.

THE STATE: Well, there's also the wheelhouse of rules of law and relevancy, Judge, and good faith basis to ask questions and that has not been shown.

THE COURT: Counsel, you still have not made an offer of proof to this Court as to what the father is going to say, so if you say to [the minor] you're testifying to what happened because your father made you and he says no, are you then calling the father to say I made you say those? How are you going to prove it up if he denies it?

DEFENSE COUNSEL: I'm going to call the father.

THE COURT: Then make your offer of proof. You told me this morning you haven't talked to him, so make your offer of proof of what the dad's going to say without having talked to him.

***

THE COURT: Well, then, counsel, you cannot ask a question of one witness premised on the fact that you are going to prove it up with someone you haven't spoken to that may or may not testify. That is not a good faith basis for asking a question.

\*\*\*

THE COURT: When did the conversation take place?

DEFENSE COUNSEL: I've been pushing [the uncle] on that. He believes—he says-

THE COURT: Because there has to be foundation. I mean, the first level is foundation is if you can't give the who, what, where, when, then you don't have the foundation to ask the question.

DEFENSE COUNSEL: \*\*\* [The uncle] does not recall the specific date of the incident and I think that is grounds for cross examination.

THE COURT: Was it before or after charges were filed?

DEFENSE COUNSEL: After.

THE COURT: So he'd already spoken to the police and he'd already been charged? Then how is he being pressured to make false allegations? The claim had already been made. You're talking about making pressures for the civil matter?

DEFENSE COUNSEL: No, I'm talking about—

THE COURT: Well, counsel, if he's already spoken to the police, the charges have already been filed. How is he being pressured to file charges that have already been filed?

DEFENSE COUNSEL: He's been being pressured to continue with the charges, Judge, and I hope—

THE COURT: That's not what you told me when we started [the] debate, counsel. You started this by saying he was pressured to make these claims. Now you're telling me these conversations were after the charges were already filed? The objection is sustained."

¶ 37     The minor testified that after February 2011, his uncle moved into his grandmother's house. The minor testified that he did not have any conversations with his uncle about the case against defendant, and that he did not have a conversation about the case with his father, either in front of his uncle or within hearing distance of his uncle. The minor testified that he did talk to a Detective Lee Schaps about his case and told Schaps about defendant pushing him onto the couch in defendant's apartment. The minor testified that it was M.M. who told him that he had been laid off. The minor testified that he never had any conversation with Deane Fraser[4] about the end of his employment. The following exchange then occurred:

"DEFENSE COUNSEL: Where do you live now?

THE STATE: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: Who do you live with now?

THE STATE: Objection.

THE COURT: Counsel, how is that relevant?

DEFENSE COUNSEL: Judge, I don't—

THE COURT: Sustained.

---

[4] Deane Fraser was the vice president of operations at defendant's workplace.

DEFENSE COUNSEL: I think it's relevant.

THE COURT: And I respectfully disagree. Sustained. He's not to disclose where he lives now or—

DEFENSE COUNSEL: Not location.

THE COURT: Who he lives with. No. No. Sustained.

DEFENSE COUNSEL: I don't have any questions right now, Judge."

¶ 38                                   2. Heather Evanoka

¶ 39        Heather Evanoka testified that on August 8, 2011, she lived next door to defendant. On this date she heard an altercation come from defendant's apartment, a door slam, and defendant yelling "I'm taking you home." On cross-examination, Evanoka testified that she heard two voices yelling back and forth. Defendant and Evanoka were living in an apartment complex, and their doors were 8 to 10 feet apart. She did not observe the two individuals involved in the altercation.

¶ 40                                   3. Motion for Mistrial

¶ 41        Defense counsel then moved for a mistrial. Defense counsel argued that the trial court had limited his opening statement and cross-examination of the minor, and as a result, the defense's case was irrefutably damaged. Specifically, defense counsel argued that he was barred from effectively introducing the minor's financial motive regarding the demand letter sent to the workplace as a result of the Lake County case. The following exchange occurred:

"DEFENSE COUNSEL: Defendant's Exhibit A says that the law firm represents [the minor]. The record must be clear on that.

THE COURT: Well, Counsel, the letter you showed the Court yesterday was that they were retained to represent the family of [the minor]. This is not the letter you showed the Court yesterday, Counsel.

DEFENSE COUNSEL: I switched it out. Judge, I said my apologies–

THE COURT: Yeah, you switched it out, Counsel. Exactly.

DEFENS COUNSEL: I handed you the second one yesterday, Judge. The record will show that. The—

THE COURT: The record will show that the letter you tendered to this Court yesterday in support of your argument said that that law firm had been hired to represent the family, I repeat, the family, of [the minor], Counsel. This is not the letter I was shown yesterday.

DEFENSE COUNSEL: Okay, Judge. Then I said—then I said, Judge, I handed you the wrong one. I said I handed you the wrong one. This is the one that shows that it's [the minor].

THE COURT: Anything else, Counsel?"

¶ 42    Defense counsel then stated that, even though the civil lawsuit had led to a completed settlement between the minor and the company, there was an ongoing financial motive to continue the allegations, because testifying on the stand that the allegations were false might lead to the company demanding a return of the settlement.

¶ 43    The trial court proceeded to respond to the claims made in the motion. The first claim stated that the trial court had ordered defense counsel to make no references to any civil actions or demands for money. The trial court responded that "this court's recollection is this court admonished counsel to be careful because there was pretrial debate as to whether that

evidence would be presented." The trial court also stated that defense counsel had yet to complete his legal research so the court was incapable of ruling on the matter before trial.

¶ 44    The motion's second claim was that the trial court had barred defense counsel from making reference to the civil action in the Lake County case during cross-examination of the minor. The court then reiterated that there were two sexual assaults that defendant was accused of committing against the minor: one in Lake County and one in Cook County. The civil litigation was related to Lake County, and any civil litigation related to the Lake County case was not properly before the court. The trial court noted:

"THE COURT: Counsel, as I indicated to you yesterday, if you were to go before this jury and put forth the fact that there was some sort of settlement that the State would then have the opportunity through the door that you opened to indicate, why was that case settled? Because he did it.

You indicated yesterday, Counsel, that you did not have a problem with evidence coming in from either a lawyer of [the company] that they determined that your client sexually assaulted this child at the company.

Well, this Court has an obligation to make sure your client receives a fair trial, and this court cannot perceive that if this jury were to hear from a civil lawyer who said he reviewed the facts, someone from [the company] that they reviewed the facts, and the reason they paid out the money is because they think he did it, I think that might prejudice your client, and that is why the Court ruled as it did."

¶ 45    The motion for a mistrial was then denied. Defense counsel then made a separate motion for substitution of judge based on section 114-5(d) of the Code of Criminal Procedure. 725 ILCS 5/114-5(d) (West 2010). The trial court gave a recess so defense

20

counsel could write his affidavit, and then transferred the motion to a different judge for a hearing. The motion was denied and the trial resumed.

¶ 46                                              4. Detective Lee Schaps

¶ 47            Detective Lee Schaps, a detective with the Mount Prospect police department, testified that, on August 20, 2011, he interviewed the minor and his father as part of his investigation into defendant's alleged sexual assault. On August 23, 2011, Schaps procured a search warrant and searched defendant's apartment.  Schaps observed a crack in defendant's door. Inside the apartment, Schaps found a gym bag with a white and a black jockstrap in it. In defendant's bedroom there was a desk with computer cords, but no computer or laptop. Schaps found, inside of a drawer in defendant's nightstand, a tube of personal lubricant. Schaps also testified that he was present when Officer David Okon, pursuant to a court order, procured a sample of defendant's DNA.

¶ 48            During cross-examination, Detective Schaps testified that the minor told him that defendant pushed him over the couch. Schaps testified that he did not direct anyone to do any forensic testing of the black jockstrap that defendant allegedly forced the minor to wear. He further testified that he did collect a comforter from defendant's bed, however, no forensic testing was completed on the comforter.

¶ 49            On redirect, Schaps testified that he did not observe any hair or stains on either the jockstrap or the comforter, and that if he had he would have had these items tested for DNA.

¶ 50                                              5. Officer Michael Wood

¶ 51            Officer Michael Wood, a patrol officer and evidence technician for the Mount Prospect police department, testified that, on August 19, 2011, he was assigned to visit the hospital where the minor was examined. Wood drove the minor to his father's apartment. In

the apartment, the minor directed Wood to the closet, where Wood recovered a grocery bag containing a white T-shirt. Wood then entered the T-shirt into the department's property evidence system. On cross-examination, Wood testified that neither he, nor Officer Ollech,[5] who was present at the time, took photos of the closet or any items located in the closet.

¶ 52                                6. Officer David Okon

¶ 53          Officer David Okon, a Mount Prospect police technician, testified that, on August 24, 2011, he received an assignment to process the T-shirt recovered by Officer Wood. He dried the shirt, packaged it, and sent it to the Illinois State Police Crime Lab. Okon further testified that, on September 28, 2011, he accompanied Detective Schaps to the Third District courthouse, where he obtained a buccal swab sample from defendant. This sample was then sent to the Illinois State Police Crime Lab.

¶ 54          During cross-examination, Officer Okon testified that his lab received a comforter, but that they did not analyze it.

¶ 55                                7. Detective Jonathan Juhl

¶ 56          Detective Johnathan Juhl, a detective with the Mount Prospect police department, testified that, on November 1, 2011, in the presence of Detective Schap, he collected DNA samples via oral swabs from the minor and his father. These samples were sent to the Illinois State Police Crime Lab. There were no questions on cross-examination.

¶ 57                                8. Ronald Tomek

¶ 58          Ronald Tomek, a forensic scientist with the Illinois state police, testified that he had received specialized training in DNA analysis and forensic biology. Tomek was found qualified in the area of forensic biology without objection, and he testified that he tested the

---

[5] The record does not reflect Officer Ollech's first name.

T-shirt sent by the Mount Prospect police department. Using an alternate light source (ALS), Tomek identified that there was a semen stain on the middle of the back of the T-shirt. Tomek removed a section of the stain for DNA testing, although he did not perform the testing himself. Tomek testified that the stain "seemed to soak through" to a portion of the front of the shirt and that this would not be uncommon for a shirt kept in a plastic bag if it had a "heavy stain."

¶ 59          On cross-examination, Tomek testified that he used an ALS on the stain located on the front of the shirt, but it did not identify the stain as semen. Tomek did not conduct any further testing on the stain located on the front of the shirt, and he did not put into his notes if there were sweat stains on the shirt. If there were, they would not have appeared using an ALS. Tomek testified that he did a "taping" of the shirt, where he placed tape over the shirt to remove hair and skin follicles. However, Tomek did not analyze or test these samples, as this was typically performed by a different lab.

¶ 60                              9. Andrew Garinger

¶ 61          Andrew Garinger, a forensic scientist with the Illinois State Police, testified that he had received specialized training in DNA analysis. He was found qualified in the area of forensic DNA analysis without objection. Garinger testified that he analyzed the sample taken from the T-shirt with standards obtained from both the minor and defendant. The sample obtained from the T-shirt matched the DNA obtained from defendant's standard. There was no DNA match between the sample obtained from the T-shirt and the DNA sample obtained from the minor. On cross-examination, Garinger testified that he did not perform any testing on the sample from the T-shirt besides the DNA testing. On redirect examination, Garinger testified that it was possible for a person to wear a T-shirt without

leaving their DNA on the T-shirt. On recross-examination, Garinger testified that he could not be sure that semen was the only bodily fluid contained on the sample of the T-shirt, and that a different lab would have been responsible for identifying if there were other fluids besides semen on the sample.

¶ 62                                  10. William Abruscato

¶ 63          William Abruscato testified that, from the end of August to the middle of November, 2011, he shared a cell in county jail with defendant. Abruscato testified he was in jail at this time for aggravated domestic battery against his wife, and for violating an order of protection. He pled guilty to this offense on December 8, 2011, and received 2 years intensive probation, 75 hours of alcohol treatment, 100 hours community service, and 90 hours of anger management classes. Abruscato testified that, before appearing in court to testify, he had served one year of probation, and that no one made a deal with him in return for his testimony against defendant. During his and defendant's mutual incarceration, defendant began to tell Abruscato about the minor. Defendant claimed that the minor told defendant that he found defendant attractive and that he liked older men. Defendant told Abruscato that he would take the minor to the gym and that one time defendant had observed the minor's penis at the gym and referred to it as an "anaconda." Defendant told Abruscato about driving the minor to work and detailed the relationship of the minor's parents. Defendant told Abruscato about the gifts he gave to the minor, such as games and clothes. Abruscato testified that defendant told him about only one incident where he brought the minor to his apartment. The first time defendant recounted the story he stated that he and the minor argued about the expiration date on an item of food. The second time that defendant told Abruscato about the incident, defendant related that he had purchased a gym item for the

minor and that the minor had modeled it for him. The minor then asked to leave and defendant slammed the apartment door to prevent him from leaving. Defendant then engaged in anal sex with the minor. After the sexual encounter, the minor was crying and Abruscato testified that "[defendant's] words exactly were to tell the kid to grow up and be a man."

¶ 64    Abruscato further testified that defendant told him that that he was concerned about his cell phone in police property. Defendant also told Abruscato that he had asked a John Velez, who was staying at defendant's apartment, to dispose of defendant's gym bag, computer, and cell phone, and to fix defendant's door. Defendant was angry with Velez because he had failed to dispose of the cell phone and gym bag, and because he had not fixed the door. Abruscato knew defendant was angry with Velez because defendant would clench his fist, stick his tongue out of his mouth, and bite his tongue. Defendant also told Abruscato that he was glad the police had not taken the comforter from his bed, because defendant had engaged in sex with the minor on top of the comforter.

¶ 65    Abruscato then testified that the reason he came forward with his testimony was because defendant had told him several times that "[h]e was going to have the boy beat up and killed with a baseball bat and make it look gang related, if there was no victim, no case, quote." After hearing these allegations, Abruscato met with a priest and then with his attorney, Douglas Zeit, and informed him of the conversations Abruscato had with defendant. Abruscato and Zeit met with a Lake County ASA and Detective Michelle Kondrat, and informed them of the conversations between Abruscato and defendant. The ASA who Abruscato spoke to was in charge of prosecuting both his case and defendant's Lake County criminal case. Abruscato testified that, before coming forward, he had been free to leave prison. However, because as a condition of his release he was required to register an address

where he would be staying, and because Abruscato did not have such a place to live, he remained in jail for several months.

¶ 66    Abruscato also testified that defendant told him about another incident that took place at defendant's workplace. Defendant "put his hands down [the minor's] pants and was kind of rough with him." Defendant was concerned about pubic hairs being left on the ground of the workplace after this incident. Defendant told Abruscato that he had made a threat to the minor that the minor's mother would lose her job if the minor told anyone about the sexual assault.

¶ 67    On cross-examination, Abruscato testified that defendant did not have any "documents" in his cell, and even if there had been documents, Abruscato was without his glasses and would have been unable to read them. Abruscato testified that he began taking notes of the conversations after talking to the priest. While he did not want to be incarcerated with the IDOC, he was confident that this would not happen, because his wife had failed to appear in court seven times and refused to press charges.

¶ 68    Abruscato further testified that before his incarceration in 2011, he had been incarcerated with IDOC for a driving-under-the-influence charge (DUI). On redirect examination, Abruscato testified that he had never been given any paperwork regarding defendant's case from either the Lake County ASA or Douglas Zeit, his attorney. He also testified that the previous DUI charge had been reduced before he was taken into custody on his domestic-battery charge.

¶ 69                                11. Douglas Zeit

¶ 70    Douglas Zeit, Abruscato's attorney, testified that Abruscato was not given consideration for the information he provided to the Lake County ASA and Detective

26

Kondrat. Abruscatto had contacted Zeit after twice meeting with a priest. On cross-examination, Zeit testified that Abruscato's DUI had been reduced to a reckless driving charge on December 8, 2011.

¶ 71                                    12. The Lake County ASA

¶ 72            The ASA who prosecuted both Abruscato and defendant for his Lake County criminal case testified that in November of 2011, he met with Detective Kondrat, Abruscato, and Zeit. During this meeting, Abruscato informed the ASA that defendant planned to have the minor murdered. The ASA never gave Abruscato any consideration for his testimony. He testified that he had previously made deals with convicted defendants to testify in court, however, he always made sure that the judge was informed of the deal because that was the only way he could enforce the deal if the defendant later refused to testify. He testified that Abruscato was already on periodic imprisonment before coming forward with the conversations with defendant. One of the reasons he allowed Abruscato to plead to lesser charges was because Abruscato's wife had lung cancer and had contacted the ASA a number of times.

¶ 73            On cross-examination, the ASA testified that he was still in the process of prosecuting defendant for his Lake County criminal case. Another reason he was willing to reduce Abruscato's DUI charge was that it had been 15 years since Abruscato had received his last DUI. He further testified that he was not in charge of Abruscato's case until after the meeting with Kondrat, Abruscato, and Zeit. He further testified that his meeting with Abruscato was not designed to make a deal, but rather to make sure that the minor was safe. The ASA also testified that Abruscato's wife refused to press charges against him. The State rested its case and defense counsel then moved for a directed verdict, which was denied.

¶ 74                                   B. Defense's Case

¶ 75          The defense's case consisted of 11 witnesses; (1) Dr. Lina Abujamra, an emergency room doctor; (2) the minor's father; (3) Kirk Cole, an employee of a sewage equipment company;[6] (4) the minor's mother; (5) Deane Fraser, vice president of operations at defendant's workplace; (6) the minor's uncle; (7) Detective Michelle Kondrat; (8) Detectve Lee Schaps; (9) Dan Markus, a customer service analyst and legal liaison for Verizon Wireless; (10) defendant; and (11) John Mariane, a record keeper for the City of Chicago, Business Affairs and Consumer Protection Department.

¶ 76                                   1. Dr. Lina Abujamra

¶ 77          Dr. Lina Abujamra, an emergency room physician, testified that, on August 20, 2011, she was working in the emergency room (ER) of a community hospital when she performed a medical exam on the minor. Dr. Abujamra had no independent recollection of the examination of the minor. According to Abjuamra's notes of the exam, the minor told the doctor that he had been anally penetrated by a penis on August 8 and August 12. Abujamra did not observe any abrasions or bruising on the minor, other than a single red spot on his neck that was unconnected to the sexual assault.

¶ 78          On cross-examination, Abujamra testified that it would not be unusual that a victim of sexual assault did not show rectal trauma two weeks after the assault took place. On redirect examination, Abujamra testified that most sexual assault victims do not display any physical abnormalities, even the day after an assault.

---

[6] The record does not reflect what Cole's actual position was in the sewage equipment company.

¶ 79                                        2. The Minor's Father

¶ 80          The minor's father testified that he had owned a sewer and plumbing company for 15 years and had never worked with defendant. The father gave defendant answers to a test to obtain a drain layer license.

¶ 81          The father testified that he had first met defendant 15 years ago, but had not really spent time with him until about five months before the incident with the minor. Defendant and the father had discussed opening a sewage business together and defendant applied for a business license for this company. The father testified that he had been to defendant's apartment "a few times" to discuss the business, but that their plans to start a business fell through because defendant was too busy to put in the effort to start the business. The father testified that defendant did not give him money to start the business. The father did not consider defendant an investor because defendant was bankrupt, and this was why defendant had approached the father with the idea of starting a business.

¶ 82          The father testified that he, defendant, and the minor had planned to have a barbecue on August 8, 2011. However, the barbecue was canceled when defendant dropped the minor off. The minor came "barging in the door. He ran in the bathroom. He stayed in there for, I think, approximately like two hours ***." The father testified that he did send text messages and make phone calls to defendant about starting a business together, but could not recall how many. The father testified that minor currently lives with him. The father further testified that he did hire a law firm to make a monetary demand from defendant's employer. The father denied ever having a conversation with the uncle regarding the sexual assault of the minor. Defense counsel then asked the father if he told the uncle that he had planted the shirt. The following exchange occurred during sidebar:

"DEFENSE COUNSEL: A few things. Certainly, the forensic analysis, I think, does change some of our earlier conversations. The Court was right. The forensic evidence is very interesting. At this point that's a brand new T-shirt.

THE COURT: Counsel, you could argue that but that's not what the evidence is.

\*\*\*

DEFENSE COUNSEL: \*\*\* I am saying a separate set of the hearsay rule. I think his statement to [the uncle] that I planted the shirt is a statement against his interest.

THE COURT: Counsel, I will allow you to ask the question, although, I believe it is on very gray grounds as to whether it is a proper question. If you want to ask him that direct question, did you tell your brother that you planted a T-shirt, I will let you ask that question."

¶ 83    The father denied telling the uncle that he had planted the T-shirt in the minor's closet. The father testified that he had been previously convicted of impersonating a police officer and that he had a current case pending on a drug charge.

¶ 84    On cross-examination, the father testified that he was not aware of the T-shirt in the minor's closet until the police recovered it. The father also testified that neither he nor his son had received any financial compensation for the assault that took place in defendant's apartment.

¶ 85                                    3. Kirk Cole

¶ 86    Before Kirk Cole was called to testify, the court and counsel engaged in a discussion relating to certain documents defense counsel planned to introduce through witnesses. In particular there was a business license obtained by defendant in defendant's name for a sewage business with the same business name as the father's sewage business. The State

argued that this document was irrelevant, because it did not list the father as a partner, and that the fact that defendant applied for a business license with the same name as the father's business was irrelevant. The trial court made the following ruling:

"THE COURT: He can ask the question. He can put in that his client submitted a—what appears to be, what the jury may find to be, a fraudulent license because he used someone else's company's name that they've been in business for 15 years. So you can certainly put that before the jury. We're done arguing this issue."

¶ 87 Kirk Cole testified that he was an employee for a company that acted as a distributor and supplier of drain cleaning equipment. Cole testified that the father was a regular customer of the company. Defense counsel asked Cole if he recognized defendant, and Cole responded that he did recognize defendant, but only from the photo defense counsel had shown him the previous day. Cole testified that, at a date he did not recall, an individual wearing a shirt and tie came in with the father to purchase equipment. Cole could not be sure that the man with the father was defendant. The father and the other individual tried to purchase $20,000 of equipment, but their credit card was declined. They then left the store.

¶ 88 4. The Minor's Mother

¶ 89 The minor's mother testified that defendant had approached her and offered, on behalf of their company, to hire the minor to do part-time work during the summer. The mother had previously been involved in the father's sewage company, and had filed the paperwork to form that business. The following exchange then occurred:

"DEFENSE COUNSEL: Okay. As a matter of fact, did you ever talk to [defendant] about filling out applications in 2011?

MOTHER: Yes.

THE STATE: Objection; foundation.

THE COURT: Sustained.

\*\*\*

(The following proceedings were had in open court out of the hearing of the jury.)

\*\*\*

THE COURT: And what is she going to say? That she talked to [defendant] about the sewer business?

DEFENSE COUNSEL: About the license.

THE COURT: You can tell—you can put in—although I continue to question its relevance in the instant case—that she had discussions with him about the sewer license. But how much more are you going to ask her about it? That's my question.

DEFENSE COUNSEL: We'd be done with it by now. I was just trying to ask about the—about the connection that she knows that he filled out the applications. She assisted in it.

THE COURT: Well, Counsel, I don't think—I don't think it's relevant. I don't think the jury is going to think it's relevant, but ask the question."

¶ 90    The following exchange then occurred:

"DEFENSE COUNSEL: \*\*\* did you have conversations with [defendant] about this company, [the sewer company]?

MOTHER: Yes.

\*\*\*

DEFENSE COUNSEL: Did you and [defendant] discuss the company?

32

MOTHER: Yes.

DEFENSE COUNSEL: Did you discuss the applications for the permits—for the licenses? Pardon me, for the licenses.

THE STATE: Objection, Judge. What does he mean by discussions, and is this hearsay?

THE COURT: Counsel, your response to the hearsay objection?

DEFENSE COUNSEL: It's statements that she—it's statements—it's information that she is giving to [defendant]. She is not an out-of-court declarant. It's not being offered for the truth of the matter asserted. It is being offered for the effect on [defendant] and for the information—

THE COURT: Based on that, Counsel, the objection is sustained.

\*\*\*

(The following proceedings were had in open court out of the hearing of the jury)

THE COURT: First of all, Counsel, in terms of your representation that it's not being offered for the truth of the matter asserted, you've told me repeatedly this morning that the fact that they were in business together was something you were trying to prove to the jury, so it is being offered for the truth of the matter asserted.

Second of all, I'm not going to allow you to bring self-serving statements of your client through this witness. It's hearsay.

DEFENSE COUNSEL: How is it self-serving, Judge?

THE COURT: Because you're trying to prove what was in this client's mind through this woman.

\*\*\*

33

(The following proceedings were had in open court in the presence and the hearing of the jury.)

\*\*\*

DEFENSE COUNSEL: Did you help [defendant] with any documents?

THE STATE: Objection.

THE COURT: Overruled. Did you help him with any documents, ma'am?

MOTHER: I helped [defendant] with some of the questions that might be on the test.

DEFENSE COUNSEL: What kind of test?

MOTHER: A drain layer test."

¶ 91    The mother testified that the father hired a law firm to bring a claim against defendant's company. On cross-examination, the mother testified that defendant was in charge of paying the minor for the work he did during the summer.

¶ 92                    5. Deane Fraser

¶ 93    Deane Fraser testified that he was the vice president of operations at defendant's employer. Fraser testified that the decision to hire minor and M.M. for the summer was made by defendant, Fraser, and the owner of the business. Fraser testified that defendant did not have the power to fire people.

¶ 94                    6. The Minor's Uncle

¶ 95    The minor's uncle testified that from February to June of 2012 he was living with the minor's grandmother in Chicago. The following exchange then occurred:

"DEFENSE COUNSEL: Okay. Now, [uncle], did you ever—did you ever hear a conversation between—did you ever hear a conversation between [the minor] and [the father] regarding this criminal case?

THE STATE: Objection.

***

(Heard in sidebar.)

***

DEFENSE COUNSEL: I believe that [the minor] said to his father that he didn't want to lie anymore.

THE COURT: He was—counsel, he never asked [the minor] that question.

***

THE COURT: But you need to lay the foundation of the specific [conversation].

DEFENSE COUNSEL: Judge, under People versus Bell, if they deny having the conversation at all, you do not need to confront with a specific statement. It is right here in this case. It is. 27 Illinois—

***

THE COURT: So you are asking him if he—what was it now? In my ruling before the witnesses took the stand, I told you you can specifically ask [the minor] whether he ever told his uncle that he was tired of lying. You never asked that question. I am not going to allow you to perfect impeachment that was not laid, especially in the area—"

¶ 96    The uncle testified that he had heard the father say several times to both the minor and the grandmother that he had planted the T-shirt used as evidence against defendant. On

cross-examination, the uncle testified that he had spent time in prison for distribution of drugs and for possession of a firearm by a convict. The uncle testified that he was not close to the father, who is his brother.

¶ 97                           7. Detective Michelle Kondrat

¶ 98           Detective Michelle Kondrat testified that she was an investigator for the Village of Buffalo Grove assigned to investigate the sexual assault involving the minor. As part of her investigation she interviewed the minor. During this interview, the minor did not mention defendant lifting up the minor's shirt in defendant's cubicle. The minor did not tell Kondrat about defendant touching the minor's penis while driving to work. Kondrat also interviewed Abrsucato, along with Zeit and the Lake County ASA. During this interview, Abruscato did not mention defendant saying that he told the minor to grow up and be a man. However, Abruscato did mention before the interview that he did not have his notes with him, and that he would be unable to remember everything that was said between him and defendant while they were cellmates.

¶ 99           On cross-examination, Kondrat testified that the minor did mention being uncomfortable around defendant. The minor did tell Kondrat that defendant touched him numerous times on his buttocks. The minor also told Kondrat about defendant inserting his fingers into the minor's anus at their workplace. Kondrat further testified that Abruscato told Kondrat about defendant slamming the door of his apartment, forcing the minor to wear a jockstrap, and that defendant raped the minor.

¶ 100                           8. Detective Lee Schaps

¶ 101           Schaps testified that he did not instruct the crime lab to perform testing on the comforter recovered from defendant's apartment. He also testified that when interviewing the

father, the father had mentioned that he and defendant were friendly and had been working on opening a business together. On cross-examination, Scaps testified that he did not think there would have been evidence on the comforter pertaining to the case at bar. On redirect examination, Schaps testified that the father had told him that defendant was an "anticipated investor" in his business.

¶ 102                                        9. Dan Markus

¶ 103           Dan Markus testified that he is a customer service analyst and legal liaison for Verizon Wireless. Markus verified the authenticity of the telephone records he was presented by defense counsel. These records were in relation to defendant's incoming and outgoing messages, and were later admitted into evidence without objection. The records detailed a number of phone calls and text messages between defendant and two individuals.[7] Some of these calls occurred after the alleged sexual assault on August 8, 2011.

¶ 104                                        10. Defendant

¶ 105           Defendant testified that he did not have the power to fire people. Defendant testified that he only checked in on the minor and M.M. to make sure they were working safely, and he would do this only between two to four times a day. Defendant testified that he purchased the boys drinks only because it was hot inside the workplace, and he had the boys eat lunch in his cubicle only to make sure they "didn't take forever." Defendant denied ever touching the minor or lifting his shirt up while in defendant's cubicle. Defendant denied ever staring at the minor's genital area while taking a break to smoke cigarettes. Defendant testified that he and the minor's father planned to go into business together, and that, per their agreement,

---

[7] The State stipulated to the phone number of defendant, the other two numbers were not directly linked to specific individuals during Markus' testimony. However, based on the father's testimony and the picture of the text message sent to the minor, these phone numbers belonged to the father and the minor.

defendant was supposed to obtain the needed licenses. Defendant did apply for these licenses. Defendant at one point went to a sewage equipment store with the father, where his credit card was declined.

¶ 106    Defendant testified that when he was arrested he had his cell phone on him. He further testified that the father and the minor had been to his apartment on numerous occasions. Defendant testified that he brought the minor and M.M. to the gym only because they asked to go, and that he did not make any mention of their body parts while at the gym. Defendant testified that he purchased the minor a Play Station 3 only at the request of the minor's father. Defendant testified that, on August 8, 2011, the day of the alleged sexual assault, defendant brought the minor to his apartment after work to retrieve his credit card and some items for the barbecue. The minor became upset when defendant suggested cooking potatoes that were past their expiration date. At this point, the minor began yelling at defendant, who did not yell in return. After this, the minor and defendant left to purchase groceries. Defendant testified that he never raped the minor or asked him to try on a jockstrap. Defendant denied ever slamming his door, and was unsure of why there was a crack in his door. When defendant and the minor reached the father's house, the father canceled the barbecue for unspecified reasons. Defendant also denied ever touching the minor at their workplace. Defendant denied ever sending a threatening text to the minor.

¶ 107    Defendant testified that he knew Abruscato as his former cellmate, but denied that he ever told Abruscato that he attacked the minor or that he planned on having the minor killed. Defendant testified that he had in his cell the police reports made available to the defense, and that he left them in his cell on occasions while he was not in the cell. Defendant testified

that the minor and his father were left alone in his apartment on a number of occasions. He had, on occasion, masturbated into white T-shirts in his apartment.

¶ 108    On cross-examination, defendant testified that he received the police reports from his counsel. Defendant testified that he did not realize that this violated the law. The exchange then occurred during a sidebar:

"DEFENSE COUNSEL: Regarding the statement to [defendant] implies [defendant] has done something improper. *** But [defendant] has not done anything improper, so I'm asking for a mistrial. It implies [defendant] did something wrong, and he did not.

THE COURT: He answered the question. He didn't know he wasn't supposed to have them.

DEFENSE COUNSEL: Would you instruct the jury [defendant] did not do anything wrong?

THE COURT: No. In doing so, I'm going to be hiding the fact that you did.

***

THE COURT: If you want to show that [defendant] didn't do anything wrong, I would maybe ask one question, 'You did not ask for the reports. You did not know you were [not] supposed to have them,' and leave it at that.

DEFENSE COUNSEL: Right."

¶ 109    Defendant testified that he did not ask for the police reports. When he applied for the business license for the business he was going to start with the father, defendant applied for the license in his name as a sole proprietor. The following exchange then occurred:

"THE STATE: And you heard the testimony of [the minor, who] testif[ied] about how from that phone number with [defendant's name,] and the number showing, 'If I found out you said something, you'll be living on the street.' You heard him testify to that, right?

DEFENDANT: Yes.

DEFENSE COUNSEL: Objection. I don't think that's a proper question to ask about prior testimony in that way.

THE COURT: Overruled."

¶ 110   Defendant testified that he did hire the minor and M.M., but only with the consent of the company's owner and Fraser. He also paid both boys out of the company's "petty cash," of which defendant was in charge. The following exchange then occurred:

"THE STATE: You're telling us by the way that [the minor] got on the witness stand here that day and told all of these people about how he was anally raped by you and digitally penetrated by you and he made the whole thing up, right?

DEFENDANT: Yes sir.

***

THE STATE: You heard Evanoka testify, from Pittsburgh, did you?

DEFENDANT: Yes, sir

***

THE STATE: And you heard her tell from that witness stand about how she heard the door slam and you yell out, 'I'm taking you home'?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

DEFENDANT: I never said that."

¶ 111    Defendant testified that, while he had given the father $19,000, he did not have any documentation of this transaction, or any documents detailing their arranged business partnership. The State then asked defendant if he was planning on perpetrating a fraud by applying for a business license in only his name, while running the business with the minor's father as a partner. Defendant denied planning to commit fraud, or that he had acted fraudulently. Defendant testified that he did buy the minor condoms, but only because the minor asked him to do so.

¶ 112    On redirect examination, defendant again denied having intentionally perpetrated a fraud.

¶ 113    On recross-examination, defendant testified that, while he had lived in his apartment for over 20 years, he had never noticed a crack in his door.

¶ 114    11. John Mariane

¶ 115    John Mariane testified that he is a records keeper who is also in charge of licenses for the City of Chicago's Business Affairs and Consumer Protection Department. Mariane testified that defendant applied online for two licenses for his sewage business. Both of these licenses were issued. On cross-examination, Mariane testified that if defendant filed the license as a sole proprietor, but was actually a partner of a business, he could have his license revoked and face jail time. On redirect examination, Mariane testified that, if someone applied as a sole proprietor, and their business model changed, they could file paperwork and pay a fee to amend their license application.

¶ 116    Defense counsel then rested.

¶ 117                                    C. The State's Rebuttal

¶ 118         In rebuttal, the State called the minor's grandmother, who testified that at no time

between February 2012 and June 2012 was there an occasion where the minor, the father,

and the uncle were in her house together or that they engaged in any conversations in her

house. She testified that defendant's case was never mentioned in her house, and that the

father and the uncle did not "get along."  The State then rested its case, and defense counsel

moved for a directed verdict, which was denied.

¶ 119                                    IV. Closing Arguments

¶ 120         The trial court discussed the following outside of the presence of the jury:

          "DEFENSE COUNSEL: Judge, I would note that the courtroom does have a dry

erase board over in the corner. I would ask to use that in my closing.

          ***

          THE COURT: Counsel, my only issue with the dry erase board is you cannot

testify before the jury.

          DEFENSE COUNSEL: Well, no, Judge. It would be a list of the points, for

example. I'm not going to put the word 'not guilty' or 'argument.' I'm not going to put

'injustice.' I'm going to put a list of points, for example—

          ***

          THE COURT: Okay. Let's bring the jury in."

¶ 121         During the defense's closing, defense counsel began to use the whiteboard, the State

objected, stating: "Your Honor, I'm going to object to this. First of all, I can't see what he's

doing; and, second of all, he's putting demonstrative evidence on the board." The following

exchange then occurred during a sidebar:

"THE COURT: Okay. Counsel, maybe I misunderstood what you said you were going to use the board for. But what exactly—as I indicated to you, I will not allow you to recreate the evidence for the jury.

¶ 122    The trial court then allowed defense counsel to continue with closing, and allowed defense counsel to continue to use the whiteboard. During defense's closing, the following exchange occurred:

"DEFENSE COUNSEL: Am I allowed to ask rhetorical questions?

THE COURT: You may ask that one, counsel, and then you have two minutes.

DEFENSE COUNSEL: I would ask for more time.

THE COURT: Counsel, you're ten minutes over the time that the Court allowed you in the first place."

¶ 123    During his closing, defense counsel stated that the minor, his father, his grandmother, and Abruscato lied, and that when there were "this many lies" in trial, the jury must vote not guilty. During the State's rebuttal, the following exchange occurred:

THE STATE: *** You know, folks, there's an old saying, country saying. It says when you get kicked by the horse the first time, it's the horse's fault. When you get kicked the second time, it's your own fault. Don't let anybody kick you into finding this guy not guilty.

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

THE STATE: Because for that to happen, you've got to believe that the evidence that was presented here was fabricated, incompetently handled, that there was perjury,

43

and the unluckiest man in the world sat over here and had a T-shirt found in his laundry."

¶ 124                                VI. Conviction and Sentencing

¶ 125        After 3½ hours of deliberations, the jury sent out a note reading: "We are now deadlocked 6-6. What is the next step?" The trial court sent the jury a note reading, "continue your deliberations." On the second day of deliberations, the jury found defendant guilty of unlawful restraint, criminal sexual assault, and aggravated criminal sexual assault.

¶ 126        On February 6, 2013, the trial court heard defense's motion for a new trial and judgment notwithstanding the verdict, which was denied, and then the court proceeded to sentencing. In mitigation, the trial court received letters attesting to defendant's good character and his work with the Salvation Army. In aggravation, the minor stated that, as a result of the sexual assault, he suffered from depression, had trouble concentrating in school, had difficulty eating, and had difficulty engaging in healthy relationships with his peers. The trial court also considered: defendant's prior criminal history, which was from a 1978 conviction for indecent liberties with a child; that defendant's action caused or threatened serious harm; that defendant utilized his professional position in furtherance of the crime; that the sentence was necessary to deter others from committing the same crime; and that defendant held a position of trust or supervision over a person who was under 18. Defendant was sentenced to 24 years with IDOC for aggravated criminal sexual assault, to be followed by a period of mandatory supervised release to be determined by the Prisoner Review Board to be anywhere from three years to life. Defendant was sentenced to 15 years with IDOC for criminal sexual assault, followed by two years of mandatory supervised release. Defendant

was sentenced to three years with IDOC for unlawful restraint, followed by one year of mandatory supervised release. All sentences were to run concurrently.

¶ 127     On February 21, 2013, defense filed and the trial court heard a motion to reconsider sentence, which was denied. This timely appeal followed.

¶ 128                                          ANALYSIS

¶ 129     On appeal, defendant claims that: (1) he was denied the ability to present a complete defense; (2) the trial court's prejudice denied him a fair trial; (3) prosecutorial misconduct denied him a fair trial; (4) the trial court erred in allowing the State to rehabilitate witnesses with prior consistent statements; (5) the trial court considered improper aggravating factors during sentencing; (6) defendant's aggravated criminal sexual assault conviction is the result of a double enhancement; and (7) the trial court erred in not vacating the conviction for criminal sexual assault, as it resulted from the same act as the conviction for aggravated criminal sexual assault.

¶ 130     For the following reasons, we find convincing only defendant's seventh claim, that the aggravated criminal sexual assault and criminal sexual assault resulted from the same act, and therefore vacate the conviction for criminal sexual assault. We affirm, and correct the mittimus to reflect only convictions for aggravated criminal sexual assault and unlawful restraint.

¶ 131                          I. Presenting a Complete Defense

¶ 132     Defendant's first claim is that he was denied his constitutional right to present a complete defense when the trial court: (1) prevented the uncle from presenting certain impeachment testimony; (2) prohibited defense counsel from introducing the civil claim during opening statement and prohibited defense counsel from cross-examining the minor

regarding the civil claim; (3) and "made interruptions" during defense's closing argument. Defendant claims these rulings created cumulative prejudice.

¶ 133    "A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense." *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 43 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)); U.S. Const., amends. VI, XIV; AND Ill. Const. 1970, art. I, § 8). Defendant argues that, because a right to a complete defense is a constitutional issue, his claim should be reviewed *de novo. People v. Burns*, 209 Ill. 2d 551, 560 (2004) ("The standard of review for determining whether an individual's constitutional rights have been violated is *de novo.*"). *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)). However, when a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion. See *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 104.

¶ 134    "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). This standard applies to motions *in limine* (*People v. Harvey*, 211 Ill. 2d 368, 392 (2004)) and the scope of cross-examination. *People v. Leak*, 398 Ill. App. 3d 798, 822 (2010). "An abuse of discretion occurs when no reasonable person would take the view adopted by the court." *Trettenero v. Police Pension Fund*, 333 Ill. App. 3d 792, 801 (2002) (citing *In re Marriage of Blunda*, 299 Ill. App. 3d 855, 865 (1998)). Moreover, the trial court's ruling will not be overturned unless the abuse of

that discretion led to manifest prejudice against defendant. *People v. Hudson*, 157 Ill. 2d 401, 435 (1993).

¶ 135                                   A. Uncle's Impeachment Testimony

¶ 136          Defendant's first claim is that the court improperly barred the uncle's testimony that he heard the minor tell his father that he did not want to lie anymore. Prior to the minor taking the stand, the trial court instructed defense counsel that "if [the minor] is on the stand *** ask him whether he told his uncle he didn't want to lie anymore, and if he denies it, then the uncle can certainly say that's what [the minor] told me."Defense counsel never asked the minor this question. Instead, defense counsel only asked the minor if he had engaged in any conversations with his father in front of his uncle, which the minor denied. Later, when defense counsel attempted to ask the uncle if he had heard the minor tell his father that he did not want to lie anymore, the court sustained an objection that defense counsel failed to lay a proper foundation for impeachment.

¶ 137          Before a witness can be impeached with a prior inconsistent statement, a proper foundation must be laid. *People v. Moore*, 301 Ill. App. 3d 728, 732 (1998). "The foundation is satisfied by presenting the place, circumstances and substance of the earlier statement to the witness and giving her an opportunity to explain the inconsistency." *Moore*, 301 Ill. App. 3d at 732 (citing *People v. Smith,* 78 Ill. 2d 298, 304-05 (1980)). In the case at bar, the trial court specifically told defense counsel that he could attempt to impeach the minor with the uncle's testimony, if he first asked the minor whether he told his uncle he did not want to lie anymore. If defense counsel had done so, he would have established a proper foundation by presenting the *substance* of the earlier statement. *Moore*, 301 Ill. App. 3d at 732. The reason

for presenting the substance of the earlier statement to the witness is to "avoid unfair surprise and to give the witness an opportunity to explain." *Smith*, 78 Ill. 2d at 304-05.

¶ 138    Defendant cites *People v. Henry*, 47 Ill. 2d 312 (1970), to support his position that, because the minor denied ever having a conversation with his father in front of his uncle, his denial was sufficient to lay the foundation for defense counsel's later introduction of the uncle's impeaching testimony. In *Henry*, a witness was asked if she had given her testimony against the defendant after receiving promises by the police. *Henry,* 47 Ill. 2d at 319. She was then asked if she had engaged in any conversations with her aunt or the defendant's sister, which she denied. *Henry,* 47 Ill. 2d at 319. When defense counsel later tried to introduce statements from the witness' aunt and the defendant's sister, stating that the witness had told them that police had told her she would be held in prison unless she gave a statement, the trial court ruled that the witness had not been questioned about her prior statement and a foundation had not been laid. *Henry,* 47 Ill. 2d at 320. Our supreme court reversed, holding that, under the circumstances of the case, a proper foundation had been laid, because there would not be unfair surprise and it would have been natural for the witness to have explained the police coercion in her testimony. *Henry,* 47 Ill. 2d at 321-22.

¶ 139    Importantly, however, our supreme court later distinguished the *Henry* decision in *People v. Smith*, 78 Ill. 2d 298 (1980). In *Smith*, a State's witness, Dickerson, was asked if he ever had a conversation with an inmate, Wicks, about the defendant's case, to which Dickerson replied in the negative. *Smith*, 78 Ill. 2d at 304. Defense counsel then tried to impeach Dickerson by having Wicks testify that Dickerson had a conversation with him in which Dickerson referred to receiving a deal for his testimony. *Smith*, 78 Ill. 2d at 304. The trial court did not allow Wicks to testify about the conversation. *Smith*, 78 Ill. 2d at 304. Our

supreme court upheld the trial court's decision, noting that the case was different than *Henry* because:

"*Henry*, however, is distinguishable in that, there, the foundation requirements were substantially satisfied. The witness was asked whether she had had a prior conversation with the impeacher specifically regarding the statement she had given to the police during their investigation of the subject crime. The purposes of the foundation requirement were satisfied, for the witness was alerted to the substance of the remark and to the identity of the person to whom it was allegedly made. The element of unfair surprise was eliminated. Since, in this case, defense counsel only asked Dickerson generally if, while at the county jail, he had spoken to Wicks about the defendant's case, the foundation requirement was not met." *Smith*, 78 Ill. 2d at 305.

¶ 140    The case at bar is indistinguishable from *Smith.* Whereas in *Henry*, the witness was specifically asked if she had been given any sort of consideration by the police before being asked if she had a conversation with her aunt or the defendant's sister, in the case at bar, there were no questions that would have given the minor any notice that his uncle would later testify that the minor told his father he did not want to lie anymore. Rather, defense counsel asked the minor only if he had any conversations with his father in front of his uncle. As such, we cannot find that the trial court abused its discretion when it did not allow the uncle's impeachment testimony that he had heard the minor tell his father that he no longer wanted to lie. *Becker*, 239 Ill. 2d at 234. In addition, in defendant's previous offer of proof, the uncle was unable to recall when the alleged conversation occurred.

¶ 141          Defendant next claims that the trial court erred by excluding the uncle's testimony that he heard the father pressure the minor to "continue in his allegations against defendant."

¶ 142          We begin by noting that, contrary to defendant's claims in his brief, when defense counsel filed his written offer of proof regarding defendant's testimony and presented his argument to the trial court that the uncle's testimony was not hearsay, the court did not simply respond "No." Actually, the conversation progressed:

          "DEFENSE COUNSEL: If it was [the minor] and somebody else, if the uncle hears—if the uncle hears people giving directions to [the minor] or influencing [the minor's] testimony or influences [the minor's] story then that would be admissible for the effect on [the minor]. In other words, if—

          THE COURT: No. Go ahead.

          DEFENSE COUNSEL: If his father is telling him, [minor], I need you to lie, then I can ask [the minor] about it."

¶ 143          It is clear from this conversation that the trial court actually said "No. Go ahead." and then allowed defense counsel to continue his argument.

¶ 144          It is also not clear that the trial court completely excluded uncle's testimony that he heard the father pressure the minor to continue his allegations against defendant. Defendant points to the following sidebar:

          "THE COURT: You want to ask the victim if his father made him bring these allegations?

          DEFENSE COUNSEL: I want to ask an alleged witness whether anyone's influencing him. I want to ask—that's what I want to ask. I want to ask a witness

50

whether or not anybody's encouraging him in any way. It is the wheelhouse of cross examination.

THE STATE: Well, there's also the wheelhouse of rules of law and relevancy, Judge, and good faith basis to ask questions and that has not been shown.

THE COURT: Counsel, you still have not made an offer of proof to this Court as to what the father is going to say, so if you say to [the minor] you're testifying to what happened because your father made you and he says no, are you then calling the father to say I made you say those? How are you going to prove it up if he denies it?

DEFENSE COUNSEL: I'm going to call the father.

THE COURT: Then make your offer of proof. You told me this morning you haven't talked to him, so make your offer of proof of what the dad's going to say without having talked to him.

\*\*\*

THE COURT: Well, then, counsel, you cannot ask a question of one witness premised on the fact that you are going to prove it up with someone you haven't spoken to that may or may not testify. That is not a good faith basis for asking a question.

\*\*\*

THE COURT: When did the conversation take place?

DEFENSE COUNSEL: I've been pushing [the uncle] on that. He believes—he says-

THE COURT: Because there has to be foundation. I mean, the first level is foundation is if you can't give the who, what, where, when, then you don't have the foundation to ask the question.

DEFENSE COUNSEL: *** [The uncle] does not recall the specific date of the incident and I think that is grounds for cross examination.

THE COURT: Was it before or after charges were filed?

DEFENSE COUNSEL: After.

THE COURT: So he'd already spoken to the police and he'd already been charged? Then how is he being pressured to make false allegations? The claim had already been made. You're talking about making pressures for the civil matter?

DEFENSE COUNSEL: No, I'm talking about—

THE COURT: Well, counsel, if he's already spoken to the police, the charges have already been filed. How is he being pressured to file charges that have already been filed?

DEFENSE COUNSEL: He's been being pressured to continue with the charges, Judge, and I hope—

THE COURT: That's not what you told me when we started at debate, counsel. You started this by saying he was pressured to make these claims. Now you're telling me these conversations were after the charges were already filed? The objection is sustained."

¶ 145    During the sidebar, three possible reasons for sustaining the State's objection were discussed: (1) defense counsel had not offered proof that the father would acknowledge this conversation; (2) defense counsel could not lay a foundation for this conversation; and (3)

because the conversation occurred after the claims were made, it was not relevant. It is not clear from the record which of these reasons were relied on by the trial court to sustain the objection. However, the trial court merely prevented defense counsel from questioning the minor about this conversation, and had not made a clear ruling that would have prevented defense counsel from introducing the testimony through the father, if defense counsel had laid a proper foundation.

¶ 146    Regardless of what reason the trial court used to sustain the objection, this issue is forfeited for review. Defense counsel did not provide an offer of proof to the trial court of what the father would testify, never laid a foundation of when this conversation occurred, and defense counsel's offer of proof regarding the uncle's testimony did not state that the uncle heard the father pressure the minor to "continue with the charges," either before or after the charges were brought. At most, on this issue, the offer of proof regarding the uncle stated: "Throughout his stay with his family, [the uncle] observed [the father] berate and yell at [the minor] repeatedly and that in [the uncle's] lay opinion, [the father] plays 'mind games' with [the minor]."

¶ 147    "It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992). "The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper." *Andrews*, 146 Ill. 2d at 421. The failure to make an adequate offer of proof results in a waiver of the issue on appeal. *Andrews*, 146 Ill. 2d at 421. "[I]n making the offer of proof, counsel must explicitly state what the excluded

testimony would reveal and may not merely allude to what might be divulged by the testimony." *Andrews*, 146 Ill. 2d at 421.

¶ 148     Because defense counsel did not make an offer of proof stating that the uncle would testify that he heard the father pressure the minor to continue with his claims, either before or after the charges were made, we cannot determine whether exclusion of the evidence was proper. *Andrews*, 146 Ill. 2d at 421. Thus, defendant has waived the issue on appeal. *Andrews*, 146 Ill. 2d at 421.

¶ 149              B. Opening Statement and Cross-Examination of the Civil Claim

¶ 150     Defendant next claims that the trial court erred by restricting his presentation of evidence regarding the civil claim to the jury. Specifically, defendant claims that the court barred defense counsel from mentioning it during opening statements and then by preventing defense counsel from cross-examining the minor regarding the civil claim. We review the trial court's decision regarding the admission of this evidence for abuse of discretion. *Becker*, 239 Ill. 2d at 234.

¶ 151     First, defendant claims that the trial court erred by barring defense counsel from referring to the civil case arising from the Lake County assault in his opening statements. Specifically, in responding to the State's motion *in limine,* the trial court stated:

> "THE COURT: What I suggest, counsel, we're going to get to opening statements. Be careful what you argue in terms of that lawsuit. I will certainly allow you to brief this for this court and I will reconsider but at this time you may not reference that settlement between the company and the victim's family for an offense that did not occur [in this case] and that's not the subject of this case.
>
>      ***

THE COURT: Counsel, until you cite me some cases that you give me or something to show why it's coming in, you may not reference a settlement in an unrelated case."

¶ 152      At this point in the trial, the court had not been presented any evidence regarding who had brought the civil case, or even that there was a civil case. On appeal, defendant has cited no case law showing that a trial court abuses its discretion when it bars reference in opening statements to a civil case stemming from a separate criminal case when, at that time, no evidence had been provided that a civil case had occurred, that the civil case was brought by the minor or his family, or that it was legally permissible to reference a civil case that was the result of a separate and distinct criminal case.

¶ 153      "The scope and latitude of the opening statement are within the trial court's discretion." *People v. Rader*, 178 Ill. App. 3d 453, 462 (1988). The trial court is tasked with determining if evidence is relevant and admissible. See *People v. Lynn*, 388 Ill. App. 3d 272, 280 (2009). In the case at bar, the trial court did not exclude all evidence of the civil case. Rather, it prevented discussion of the civil case during opening statements, until evidence of it could be presented to the trial court and the trial court could make a determination as to the evidence's relevance and admissibility. We cannot find that the trial court abused its discretion by requiring defendant to present the trial court with evidence before determining if the evidence was relevant and admissible. *Becker*, 239 Ill. 2d at 234.

¶ 154      Defendant next claims that the trial court erred by not allowing defense counsel to cross-examine the minor about the civil claim. However, the evidence presented regarding the civil claim stated only that the minor's parents had hired a law firm to represent the minor. *Supra* ¶ 23. Further, the record reflects that a monetary demand was made by the law

firm and then the claim was settled with defendant's employer. There is no evidence that minor was involved in this settlement, or that he was aware of it. Our supreme court has found it improper for counsel to ask witnesses questions for the purpose of impeachment unless counsel is prepared to offer proof of the impeaching information. See *Hudson*, 157 Ill. 2d at 435; see also *People v. Olinger,* 112 Ill. 2d 324, 341 (1986). Moreover, the evidence used to impeach a witness must not be " 'remote or uncertain.' " *People v. Sims*, 192 Ill. 2d 592, 625 (2000) (quoting *People v. Triplett*, 108 Ill. 2d 463, 476 (1985)). In the case at bar, there was no evidence that the minor was a party to a lawsuit, or that he was aware of the settlement. Therefore, the trial court did not abuse its discretion by preventing defense counsel from cross-examining the minor in regard to the civil case. *Becker*, 239 Ill. 2d at 234.

¶ 155　　　　　Even if the trial court had abused its discretion, which we are not prepared to say, defense counsel was allowed to question both the father and mother extensively regarding the civil case. "As a reviewing court, we are not required to isolate the particular limitation on cross-examination to determine whether reversible error has occurred." *People v. Harris*, 123 Ill. 2d 113, 145 (1988). "[I]f a review of the entire record reveals that the jury has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant has been prohibited on cross-examination from pursuing other areas of inquiry." *Harris*, 123 Ill. 2d at 145. Through cross-examination of both the father and the mother, the jury was made aware of the defense's theory that defendant was framed for a monetary settlement; thus, the exclusion of the civil case during opening arguments and cross-examination of the minor were not manifestly prejudicial. *Hudson*, 157 Ill. 2d at 435; *Harris*, 123 Ill. 2d at 145. In addition, we cannot say

that the trial court abused its discretion in ultimately determining that a civil settlement in the Lake County case was not relevant to the case in Cook County. *Becker*, 239 Ill. 2d at 234.

¶ 156                    C. Defendant's Closing Arguments

¶ 157        Defendant next claims that the court "made repeated interruptions, improper rulings and comments" during defendant's closing argument. Defendant acknowledges that he did not object at trial and did not include this issue in his posttrial motion for a new trial. However, "the application of the waiver rule is relaxed when the trial judge's conduct would have been the basis of the objection." *People v. Crawford*, 343 Ill. App. 3d 1050, 1055 (2003). This is "[b]ecause of the fundamental importance of a fair trial and the practical difficulties in objecting to the conduct of the trial court." *People v. Westfield*, 207 Ill. App. 3d 772, 778 (1990). "In order for the comments by a judge to constitute reversible error, the defendant must show that the remarks were prejudicial and that he was harmed by them." *Westfield*, 207 Ill. App. 3d at 778.

¶ 158        "In general, wide latitude is afforded counsel in closing argument." *Crawford*, 343 Ill. App. 3d at 1058 (citing *People v. Carter,* 177 Ill. App. 3d 593, 601 (1988)). "Argument and statements that are based upon the facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper closing argument." *Crawford*, 343 Ill. App. 3d at 1058-59 (citing *People v. Brown,* 275 Ill. App. 3d 1105, 1114 (1995), and *People v. Simmons,* 331 Ill. App. 3d 416, 421 (2002)).

¶ 159        Contrary to defendant's claim, the trial court never once interrupted defendant's closing arguments. Rather, the comments made by the court were directly in response to objections from the State.

¶ 160    Also, contrary to defendant's claims, the trial court did not cut off defendant's closing statements early. Instead, the record reflects that, when the trial court gave defense counsel a warning that he was almost out of time, he was already 10 minutes over his allotted time. *Supra* ¶ 122. It is within the trial court's discretion to set and enforce reasonable time limits for closing arguments. *People v. Trolia*, 107 Ill. App. 3d 487, 502 (1982).

¶ 161    The record also reveals that the court did not improperly address defense counsel or the jury during closing arguments. A number of times, the State objected when defense counsel attempted to argue facts that were outside either the evidence or a reasonable inference from it. *Crawford*, 343 Ill. App. 3d at 1058-59. The following is an example of the exchanges that occurred during defense's closing argument:

> "DEFENSE COUNSEL: Common sense says that the time frame doesn't work. *** [T]ake a look at the shirt. This shirt was absolutely positively not worn by [the minor]—
>
> THE STATE: Objection. That's not the evidence.
>
> DEFENSE COUNSEL: Judge—
>
> THE COURT: Counsel, I will once again advise you to argue the evidence before the jury and reasonable inferences from the evidence.
>
> ***
>
> DEFENSE COUNSEL: *** You'll get to feel this T-shirt. It's not stretched at all. It's right out of the bag.
>
> THE STATE: Objection, Judge. That's not the evidence, that it came out of the bag.

THE COURT: Once again, ladies and gentlemen, if a lawyer makes a statement that is not based on the evidence or reasonable inferences to be drawn from the evidence, you should disregard that statement.

Counsel, you may continue.

\*\*\*

DEFENSE COUNSEL: \*\*\* [Defendant] masturbated into a fresh shirt that's his, and then he threw it in his laundry or threw it on the ground. \*\*\* But if somebody sees—if people like [the father], see a wadded up shirt, kind of sticking together, it's clear what it is. That's how this happened.

THE STATE: Objection, Judge.

THE COURT: One [*sic*] again, ladies and gentlemen, if a lawyer makes a statement that is not based on the evidence or reasonable inferences to be drawn from the evidence you should disregard that statement."

¶ 162    There was no evidence presented at trial that showed, or could lead to a reasonable inference, that the shirt was never worn before ejaculate was stained on to it. It was thus not an abuse of discretion for the judge to sustain an objection and then inform the jury that "if a lawyer makes a statement that is not based on the evidence that you have heard or reasonable inferences from the evidence, you should disregard that statement." See *Crawford*, 343 Ill. App. 3d at 1058-59.

¶ 163    Defendant also objects to the trial court's sustaining the State's objection to defense counsel's comment that "if people like [the father], see a wadded up shirt, kind of sticking together, it's clear what it is." Defendant argues that, because defendant testified that he masturbated into a shirt, and because the uncle testified that he overheard the father state that

he planted the shirt, there was adequate evidence to support counsel's statement. However, the fact that defendant testified that he once masturbated into a shirt does not allow a reasonable inference as to the father's knowledge of what semen-stained clothes look like. The uncle did testify that he overheard the father state that he planted the T-shirt, but the uncle did not testify that he overheard the father state that he procured the T-shirt, nor did the uncle testify as to the accuracy of the father's sight. Thus, there was no evidence to show or to make a reasonable inference that the father was the sort of person who would easily identify a stained shirt as having been stained with semen. *Crawford*, 343 Ill. App. 3d at 1058-59.

¶ 164                      D. Cumulative-Error Prejudice

¶ 165          Defendant further claims that when all of these claims are examined together, they constitute cumulative error resulting in prejudice that denied defendant his constitutionally protected right to present a complete defense. *Ramirez*, 2012 IL App (1st) 093504, ¶ 43. However, because we were not persuaded by any of defendant's claims, we need not consider if they cumulatively led to prejudice. See, *e.g.*, *People v. Perry,* 224 Ill. 2d 312, 356 (2007) (in rejecting each of defendant's claims, cumulative error analysis was not necessary).

¶ 166                      II. Right to a Fair Trial

¶ 167          Defendant's next claim is that the trial court showed hostility towards the defense throughout the trial and, in doing so, denied defendant his right to a fair trial. Defendant claims that this hostility was apparent because the trial court made inappropriate comments in front of the jury, and made inconsistent rulings that restricted the defense.

¶ 168                                A. Judge's Comments

¶ 169          Defendant claims that the trial court's comments to the jury created prejudice and deprived him of a fair trial.

¶ 170          "A trial judge has a duty to see that all persons are provided a fair trial." *Sims*, 192 Ill. 2d at 636 (citing *People v. Burrows*, 148 Ill. 2d 196, 250 (1992)). "Accordingly, a trial judge must refrain from interjecting opinions, comments or insinuations reflecting bias toward or against any party." *Sims*, 192 Ill. 2d at 636 (citing *People v. Garrett*, 276 Ill. App. 3d 702, 712 (1995)). "Judicial comments can amount to reversible error if the defendant can establish that such comments were " ' "a material factor in the conviction or were such that an effect on the jury's verdict was the probable result." ' " *Sims*, 192 Ill. 2d at 636 (quoting *Burrows*, 148 Ill. 2d at 250, quoting *Harris*, 123 Ill. 2d at 137).

¶ 171          Defendant claims the trial court objected to defense counsel's statements *sua sponte*. It does not appear from the record that this occurred. Each "*sua sponte*" objection defendant identifies in his brief was edited to remove both the "sustained" before the comment and the response from the State. For example, defendant's brief claimed the judge *sua sponte* objected to one of defense counsel's questions by stating, "that's not what his testimony was counsel." Actually, the complete exchange was:

          "DEFENSE COUNSEL: Did you tell Detective Kondrat that he pulled up your shirt and touched your stomach in his office?

          MINOR: No.

          THE COURT: Sustained. That's not what his testimony was, counsel.

          THE STATE: Thank you, Judge."

¶ 172        When the full exchange is quoted, the judge appears to be responding to the State which was in the process of making an objection. The trial court's "sustained" appears to be a reaction to an action by the prosecutor, who then stated "Thank you." The trial court should not have "jumped the gun" and should have waited for the state's objection, and thus the trial court's comment and ruling was improper. However, this was an isolated instance and certainly not a material factor in defendant's conviction where the evidence was overwhelming. *Sims*, 192 Ill. 2d at 636.

¶ 173        Defendant does not cite case law in which a trial judge made comments similar to the judge in the case at bar and was found to be hostile. Instead, defendant exhaustively lists comments by the trial judge, often selectively edited. Defendant points to comments from the court such as: (1) "He answered it on cross already. This is beyond the scope of redirect. I did allow you some leeway. Ask your next question."; (2) "Counsel, he just testified he's never spent the night at [defendant's] house. You can go through any date you want, if he's never spent the night there, he's never spent the night there. Sustained."; (3) "Sustained as to the form of the question. That's improper. Ask a proper question"; and (4) "Sustained; not the testimony." When these comments are placed in context, they do not appear hostile. Nor were the judge's comments during *voir dire* of such caliber that they would prejudice the jury against defendant before trial began. For instance, "it is not for you to comment, sir" is not overtly hostile.

¶ 174        This is not a case such as *People v. Crawford*, 343 Ill. App. 3d 1050 (2003), where the trial court accused defense counsel of lying. *Crawford,* 343 Ill. App. 3d at 1058. Nor is this a case such as *People v. Eckert*, 194 Ill. App. 3d 667 (1990), where the trial court coupled its comments with a refusal to allow defense counsel to tender an offer of proof.

*Eckert*, 194 Ill. App. 3d at 670. Rather, this case is far closer to *People v. Garrett*, 276 Ill. App. 3d 702 (1995), where the court made the comments " '[i]f you're going to prove it, fine. I will let you ask that question. If you aren't, you're not going to infer it' " and " '[h]e didn't say he was a gang leader, you said he said was (*sic*) a gang leader.' " *Garrett*, 276 Ill. App. 3d at 712. Just as in *Garrett*, the trial judge in this case "was attempting to control the trial rather than disparage defense counsel. Each of the comments had a valid basis and did not display a specific bias or prejudice against defense counsel." *Garrett*, 276 Ill. App. 3d at 713. Even if some of the trial judge's comments, particularly during sidebars, demonstrated frustration with defense counsel, that does not inherently mean that the judge was displaying bias. See, *e.g.*, *People v. Nevitt*, 135 Ill. 2d 423, 457 (1990). The trial court's comments in front of the jury do not here rise to the level of bias or prejudice. *Sims*, 192 Ill. 2d at 636.

¶ 175 Defendant also claims that the trial court's hostile comments prevented the jury from learning defendant's cellmate Abruscato's motive for testifying, as well as where the minor was currently living, which defendant claims would have helped prove the father's influence over the minor. In regard to the minor testifying about where he currently lived, the cross-examination would have been repetitive because one of the first questions the State asked the minor was who he currently lived with, and the minor testified that he was living with his father. When the father took the stand, he also testified that the minor was currently living with him. Therefore, evidence of the minor's current residence was fully before the jury. The same is true in regard to cellmate Abruscato's testimony. Defense counsel questioned Abruscato, Abruscato's lawyer, and the Lake County ASA extensively regarding: (1) Abruscato's previous charges, (2) the timeline regarding when those charges were brought and when they were reduced, and (3) whether Abruscato received consideration for

testifying. None of the trial court's comments during this testimony were overtly hostile. Moreover, because the jury heard this evidence multiple times, the judge's comments could not have been a material factor in the jury's verdict. *Sims*, 192 Ill. 2d at 636.

¶ 176                              B. Judge's Rulings

¶ 177          Defendant did not include any of the rulings discussed below in his posttrial motion for a new trial and judgment notwithstanding the verdict. However, defendant urges us to review the allegedly inconsistent rulings under the plain-error doctrine.

¶ 178          If a defendant fails to object in a timely manner at trial or fails to object in a posttrial motion, a reviewing court will generally review the defendant's claim only for plain error. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). The plain-error doctrine "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565 (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

¶ 179          Under the first prong, the defendant must show that the evidence at trial was so closely balanced that the error alone "threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187. Under the second prong, the defendant must prove that the error was so serious that it affected the fairness of the trial and questions the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187. " 'In both instances, the burden of persuasion remains with the defendant.' " *Piatkowski,* 225 Ill. 2d at 565 (quoting *Herron,* 215 Ill. 2d at

187). However, before considering plain error, we must first determine whether any error occurred at all. *Piatkowski*, 225 Ill. 2d at 565 (in order to claim plain error, defendant must show "first" that an error occurred).

¶ 180    "Illinois courts have long upheld the right of an accused to a fair and impartial trial by jury, 'free from influence or intimation by the trial court.' " *People v. Mitchell*, 228 Ill. App. 3d 167, 169 (1992) (quoting *People v. Sprinkle*, 27 Ill. 2d 398, 402 (1963)); see also *People v. Santucci*, 24 Ill. 2d 93, 98 (1962). "Our supreme court has cautioned that jurors are 'ever watchful of the attitude of the trial judge' and noted that the judge's lightest word 'may prove controlling.' " *Mitchell*, 228 Ill. App. 3d at 169 (quoting *People v. Marino*, 414 Ill. 445, 450-51 (1953)). "Moreover, the appellate court has held that a conviction tainted with such judicial error must be reversed 'to protect and preserve the integrity and reputation of the judicial process.' " *Mitchell*, 228 Ill. App. 3d at 169 (quoting *People v. Kelley*, 113 Ill. App. 3d 761, 767 (1983)).

¶ 181    Defendant first claims that the trial court erred when, before opening statements, it held that defense counsel could not refer to the civil claim, and when, later in discussion of defense's motion for mistrial, stated that it only "advised" against mentioning the claim. *Supra* ¶¶ 16, 43. Defendant also claims that, during this same discussion, the trial court claimed that defense counsel was showing it a different demand letter from the law firm regarding the monetary demand on defendant's workplace, although it was the same letter that defense counsel had submitted previously. *Supra* ¶ 41. We already ruled that the trial court did not abuse its discretion when it barred defense counsel from referring to the civil claim in opening statements and when it barred defense counsel from cross-examining the minor in regards to the civil claim. *Supra* ¶¶ 152-53.

¶ 182        Moreover, defendant is not claiming that the trial court denied the defense's motion for a mistrial based on its imperfect recollection of previous conversations. Indeed, the trial court denied the motion for mistrial for a number of reasons completely separate from the two comments mentioned by defendant, including defense counsel not yet presenting the court with case law that the civil case should be admitted and the need to prevent defendant from being prejudiced by someone at defendant's workplace testifying that they settled the civil claim because they believed the evidence against defendant. Rather, defendant is claiming that the very fact that the trial court did not recall previous conversations entirely accurately amounts to an inconsistent ruling. However, defendant does not cite any case law that finds that a judge making a statement reflecting a less-than-perfect memory amounts to reversible error. We also note that this conversation took place outside the hearing of the jury, so there was no chance that jurors might be swayed by the judge's inconsistent recollection. *Mitchell*, 228 Ill. App. 3d at 169.

¶ 183        Defendant next claims that the judge made an inconsistent ruling by telling defense counsel during a sidebar that he could ask the mother if she had conversations with defendant regarding the " 'sewer license,' " although the judge did warn defense counsel that the question seemed to be veering towards the edge of irrelevancy. *Supra* ¶ 89. When defense counsel attempted to ask the mother about the sewer license, the State objected, claiming that the answer would be hearsay. *Supra* ¶ 90. The judge asked defense counsel what his response was to the hearsay objection, and defense counsel responded "It's statements that she—it's statements—it's information that she is giving [defendant.] She is not an out-of-court declarant. It's not being offered for the truth of the matter asserted. It's being offered for the effect on [defendant] and for the information—" The judge then sustained the objections.

Defendant claims that this is an inconsistent ruling, as the judge had given defense counsel permission to ask the question, and was therefore "sandbagging" defense counsel with the intent of making him look foolish. Notably, defendant does not claim on appeal that the trial court erred in finding the testimony hearsay, simply that the court erred in allowing defense counsel to ask the question and then sustaining the State's objection.

¶ 184    The judge told defense counsel that he could ask the question outside the hearing of the jury, so the only thing the jury heard was defense counsel ask a question and the court sustain an objection. The judge sustained numerous objections for both sides during the trial, so it is unreasonable to think that the judge sustaining this particular objection would have swayed the jury. *Mitchell*, 228 Ill. App. 3d at 169.  As defendant was not prejudiced because the jury did not hear the judge's previous comment, this is essentially an evidentiary question that will not be overturned unless the judge abused her discretion and it results in manifest prejudice. *Hudson*, 157 Ill. 2d at 435. Defense counsel was allowed to ask the mother numerous questions relating to conversations with defendant about the business as well as whether she helped defendant prepare for or obtain the needed licenses.  If the jury heard that the mother helped defendant prepare to obtain the licenses, the fact that the mother was not allowed to testify that she also had conversations with defendant regarding the licenses would not rise to the level of manifest prejudice. *Hudson*, 157 Ill. 2d at 435.

¶ 185    Defendant next claims that the court made an inconsistent ruling regarding defense counsel's use of a whiteboard during closing arguments. The judge told defense counsel he could use a whiteboard during closing arguments, but would not be allowed to use it to present evidence. *Supra* ¶ 120. The State objected during defense counsel's closing arguments because he appeared to be using the board to present evidence. *Supra* ¶ 120.  The

court held a sidebar to ensure that defense counsel was using the board in keeping with the court's previous ruling. Once defense counsel explained how he was using the board, the judge allowed him to continue to use the board. *Supra* ¶ 120. Defense counsel was given over 10 minutes of extra time during his closing arguments, so he was not negatively impeded by the time it took to have a sidebar. We do not find that the judge acted inconsistently in any manner through this exchange.

¶ 186    Defendant next claims that the court made inconsistent rulings regarding the T-shirt. During one sidebar, defense counsel said " 'At this point, that's a brand new T-shirt.' " The judge responded " 'you could argue that but that's not what the evidence is.' " *Supra* ¶ 82. During closing arguments, defense counsel attempted to tell the jury that the shirt was "right out of the bag." The State objected, and the court sustained the objection, finding that it was not in keeping with the evidence. This comment was in the middle of trial, indicating that defense counsel could still attempt to introduce evidence regarding the T-shirt, and the judge also told defense counsel that, as of that moment, "that's not what the evidence is." Defense counsel could not have been surprised when he was reminded during closing arguments that he could only argue the evidence presented and reasonable inferences from that evidence. *Crawford*, 343 Ill. App. 3d at 1058-59.

¶ 187    Defendant's next claim is that the trial court sustained objections by the State and then, once defense counsel asked for a sidebar, asked the State "[y]our objection, State?" and "[w]hat's your objection?" These comments were part of the following exchanges:

"DEFENSE COUNSEL: Okay. And did [the father] ever come back in the next few days to make any purchases?

THE STATE: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: Judge, I think that's relevant.

THE COURT: Sustained.

DEFENSE COUNSEL: Okay. When was the next time you saw [the father]?

THE STATE: Objection.

THE COURT: Sustained.

DEFENSE: Judge, I don't—I didn't—Judge, may I have a sidebar?

THE COURT: Sure. ***

(The following proceedings were had in open court out of the hearing of the jury.)

THE COURT: Your objection, State?

THE STATE: What is the relevance of [the father], who he says he has somewhat of an ongoing business relation, coming in afterwards and not with the strange fellow?

THE COURT: Counsel, all that is before this jury is that [the father] came in with a male with a suit and tie. He was only able to identify this man sitting in court as the man you showed him a picture of. You indicated you were calling him for the purpose of establishing that they purchased equipment on that date—

DEFENSE COUNSEL: They tried to.

THE COURT:—and that's not what he said.

***

[The following proceedings were had in open court in the presence of the jury]

DEFENSE COUNSEL: Why did you put just your name on the application?

THE STATE: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: Judge, he was asked that.

THE STATE: I never asked him that question, Judge.

THE COURT: Brief Sidebar. Excuse us, ladies and gentlemen.

(Proceedings held at sidebar, outside the presence of the jury.)

THE COURT: What's your objection?

THE STATE: Objection is why he did so. He was asked isn't it true yours was the only name on there. Now all of a sudden why.

THE COURT: Counsel, are you seeking to elicit?

DEFENSE COUNSEL: I think I can clear that up. [The State] went through why [the father's] name isn't on anything, why was this a sole proprietorship."

¶ 188    We need not address this as an inconsistent ruling, because defendant has selectively edited the record. When taken in context, it does not appear from the record that the judge is asking these questions because the judge is unsure of what the objection was, but rather to give the State a chance to fully explain its objection. It is notable that the judge then allowed defense counsel to respond. There is nothing inconsistent with allowing both sides to explain their positions when defense counsel asks for a sidebar.

¶ 189    Defendant's next claim is that the court was inconsistent because it required defense counsel to make offers of proof, but did not require the State to do the same. "A detailed and specific offer of proof is necessary when it is not clear what the witness' testimony will be or his basis for so testifying." *People v. Cobb*, 186 Ill. App. 3d 898, 905 (1989) (citing *People v. Robinson*, 56 Ill. App. 3d 832, 837 (1977)). In the case at bar, it was very clear why the

70

State's witnesses were being called: they were all either a victim of the crime, investigators of the crime, or had direct conversations with defendant regarding the crime. In comparison, defense counsel wanted to call the uncle, who at the outset appeared to have only heard a conversation between two people from a different room, and a number of people such as bankers or employees of sewage equipment stores. It appeared that much of this testimony would either be hearsay or irrelevant, so it was not error for the trial court to ask for more information or offers of proof because it was "not clear what the witness' testimony [would] be or his basis for so testifying." *Cobb*, 186 Ill. App. 3d at 905.

¶ 190    Lastly, defendant claims that the trial court erred by not instructing the jury that defendant did nothing wrong by having the police reports in his cell, and the court responded " 'No. In doing so, I'm going to be hiding the fact that you did.' " *Supra* ¶ 108. The court did not err because it then walked defense counsel through several questions to ask defendant to make sure the jury was allowed to hear that defendant was unaware that his possession of the reports violated a rule and that defendant had not elicited defense counsel to giving him the reports. Defense counsel's objective in asking the court to instruct the jury was satisfied with this line of questioning.

¶ 191    For the reasons stated above, we do not find that the trial court made errors in its rulings. As such, we do not find that a plain-error analysis is warranted. *Piatkowski*, 225 Ill. 2d at 565.

¶ 192                               III. Prosecutorial Misconduct

¶ 193    Defendant next claims that he was denied a fair trial due to a pervasive pattern of prosecutorial misconduct. Specifically, he claims that the prosecutor denied defendant a fair trial by: (1) accusing defendant of committing other crimes; (2) asking defendant to comment

on the credibility and testimony of other witnesses; (3) making improper testifying objections during trial; (4) distorting the burden of proof during rebuttal closing argument; and (5) cumulative error. Defendant agrees that these issues were not preserved by being included in the posttrial motion for a new trial, but urges us to review them for plain error. *Piatkowski*, 225 Ill. 2d at 564. Again, before we can perform plain-error analysis, we must first determine whether any error occurred at all. *Piatkowski*, 225 Ill. 2d at 565.

¶ 194        Prosecutorial misconduct can deprive a defendant of his right to a fair, orderly, and impartial trial. *People v. Johnson*, 208 Ill. 2d 53, 60 (2003). "[A] pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine." *Johnson,* 208 Ill. 2d at 64.

¶ 195        A. Accusing Defendant of Other Crimes

¶ 196        Defendant first claims that the prosecutor erred by accusing defendant of breaking the law by possessing police reports in his cell and by committing fraud by applying for a business license as a sole proprietor with the intent to run the business as a partnership. These claims are considered in regard to the proper scope of cross-examination. As a result, we will only reverse if the trial court abused its discretion by allowing the prosecutor to ask these questions. *Becker*, 239 Ill. 2d at 234.

¶ 197        It is not erroneous to ask a witness about a crime that is supported by the record and relevant to the case. See, *e.g.*, *People v. Howell*, 358 Ill. App. 3d 512, 523 (2005) (prosecutor commenting about a battery committed by defendant, that was not the crime being tried, during closing arguments, was not error when relevant to the case and supported by the record); see also *People v. Hobbs*, 232 Ill. App. 3d 63, 71 (1992) ("While it is improper for a prosecutor to proffer evidence of other crimes than the one for which defendant is charged, a

prosecutor can argue any logical inferences that can be drawn from the evidence."). Notably in this case, the prosecutor did not introduce the evidence of defendant committing other crimes, defense counsel did. Defense counsel attempted to support his theory that Abruscato was conspiring with Abruscato's attorney and the Lake County ASA to frame defendant by having defendant testify that Abruscato learned about defendant's case because defendant had police reports in his jail cell. It was error for the State to ask questions inquiring if defendant knew he was breaking the law by possessing the police reports. The defense objected and the objection was overruled, and the trial court was in error in doing so and abused its discretion. However, this was harmless error because the evidence against defendant was overwhelming. *Piatkowski*, 225 Ill. 2d at 565.

¶ 198        However, the State's question in regard to the business license was proper. The defense's case rested on the notion that defendant was framed by the minor's father. To support that case, defense counsel introduced a great deal of evidence regarding the business license, which defendant created as a sole proprietor. Defendant claimed that even though the license was only in his name, it actually was for a business that he and the minor's father were starting together. It was perfectly reasonable that the State would try to refute this claim by asking defendant if he was claiming that he had committed fraud to create this business. If defendant had not committed fraud in obtaining the license, then the evidence introduced by defense counsel was irrelevant.

¶ 199        Defendant cites *People v. Thomas*, 22 Ill. App. 3d 854 (1974), in which the court found reversible error when the prosecutor accused the defendant, who had no prior criminal record and had yet to present his defense, of being a "criminal." *Thomas*, 22 Ill. App. 3d at 857. In stark contrast, in the case at bar, not only was defendant in the process of presenting

his defense, he had introduced the other crimes evidence the State was questioning him about. Moreover, the State never went so far as to call defendant a "criminal." Rather, the State was questioning the veracity of defendant's claims by inquiring if he understood that he was introducing evidence of other crimes in order to refute the crime he was on trial for.

¶ 200    B. Asking Defendant to Comment on Credibility of Witnesses

¶ 201    Defendant next claims that the State engaged in prosecutorial misconduct when it asked defendant to comment on the testimony of the minor, Evanoka, and Abruscato. Since this claim concerns the proper scope of cross-examination, we will only reverse if the trial court abused its discretion by allowing the prosecutor to ask these questions. *Becker*, 239 Ill. 2d at 234.

¶ 202    It is generally improper for a prosecutor to ask a defendant to comment on the veracity of other witnesses. *People v. Turner*, 128 Ill. 2d 540, 558 (1989). However, it can be acceptable if the questions are intended to have defendant explain his story in the light of overwhelmingly conflicting evidence. *Turner*, 128 Ill. 2d at 558.

¶ 203    In the case at bar, there was overwhelming conflicting evidence. There was DNA on the minor's T-shirt, and the police found the lubricant and jockstraps exactly where the minor testified they were located. Defendant sent the minor a text message that said "If I find out you told anyone, you'll be living on the streets." Defendant's response to this was that the minor was being coerced by his father to frame defendant. Abruscato testified that defendant described the sexual assault in detail and on a number of occasions. The defense's theory that Abruscato only testified to obtain an undisclosed deal was refuted by Abruscato, his defense attorney, and the Lake County ASA. The uncle's testimony that he had overhead the father comment that he had framed defendant was contradicted by the minor, his father, and his

grandmother, who all testified that the uncle and the father were never in the same house together. Defendant testified that he never raised his voice to the minor when they were both in defendant's apartment, yet Evanoka, a neighbor who had nothing to gain from her testimony, testified that she heard defendant yelling with another person.

¶ 204    In light of this evidence, the State did not commit error when it asked defendant if he had heard the testimony of these witnesses and then questioned defendant on how his version of events differed so crucially from the other witnesses. As such, we cannot find that the trial court abused its discretion by allowing the State to question defendant about the testimony of the other witnesses. *Becker*, 239 Ill. 2d at 234.

¶ 205    Defendant also claims that the State engaged in misconduct for the following exchange between the State and the Lake County ASA:

"THE STATE: [ASA], as an attorney, as a State's Attorney and as a Commander in the United States Navy—

DEFENSE COUNSEL: I will object.

THE STATE: —is it your job to judge the credibility of people when you have conversations with them as to their integrity and honestly [*sic*]?

DEFENSE COUNSEL: Objection.

THE COURT: Sustained as to the form of the question.

THE STATE: Do you make decisions in your job as to witness credibility of people that you're going to put on the witness stand?

DEFENSE COUNSEL: Objection.

THE COURT: Sustained."

¶ 206    Defendant claims that even though the court sustained the objection, the fact that the State asked the question twice was prejudicial. Defendant does not state, however, how this line of questioning was prejudicial. Notably, the court sustained his objection. We note that "a ruling sustaining a defense objection generally is sufficient to cure any prejudice that may have occurred." *People v. Desantiago*, 365 Ill. App. 3d 855, 866 (2006) (citing *People v. Edwards*, 195 Ill. 2d 142, 168 (2001)). In this case, the State was attempting to ask a witness if he generally engaged in judging witnesses credibility. When the court sustained the first objection as to the form of the question, the State attempted to ask the question in a different form. This was also objected to, and the State then ended this line of questioning. At this point, the State had not received a response from the ASA, nor did the State ever ask the ASA if he found any particular witness credible. Thus, given the relatively short exploration if the ASA, as part of his job, had to assess witness credibility, with no response ever being given, we find that the court sustaining defense's objection was enough to cure any prejudice. *Desantiago*, 365 Ill. App. 3d at 866.

¶ 207    Accordingly, we do not find that the trial court abused its discretion by allowing the State to ask these questions during cross-examination. *Becker*, 239 Ill. 2d at 234.

¶ 208                          C. The State's Testifying Objections

¶ 209    Defendant next claims that the prosecutor made inappropriate "testifying" objections. Defendant points to a large number of objections, and two exchanges in particular:

"DEFENSE COUNSEL: At your father's house?

MINOR: I wasn't present when—

THE STATE: Objection as to the father's house. Judge. This was the issue of a sidebar, Judge, that we just had. This was not at the grandmother's house. This is at the father's house now.

DEFENSE COUNSEL: The [address].

THE COURT: Overruled.

***

DEFENSE COUNSEL: [The State] asked you about whether or not—if there were any specific documents regarding the $19,500 check, do you recall that?

DEFENDANT: Yes, I do.

THE STATE: Your Honor, that was not my question.

THE COURT: Counsel, I think you misstated the evidence. Objection sustained.

DEFENSE COUNSEL: [The State] asked you about the withdrawal of funds on August 16th.

THE STATE: Your Honor, Objection. I asked if there was anything with the name [the father] on any of those checks.

THE COURT: Sustained."

¶ 210     "An objection is intended only to state the fact of the objection and the evidentiary basis therefor." *People v. Blue*, 189 Ill. 2d 99, 136 (2000) (citing *Eizerman v. Behn*, 9 Ill. App. 2d 263, 287 (1956)). It is improper for prosecutors to attempt to introduce contrary evidence through their objections. See *Blue*, 189 Ill. 2d at 136. In making inappropriate "testifying" objections, "the State gain[s] an unfair advantage: it is probable that the jury endow[s] the remarks made by government representatives with greater credibility than is normally accredited to witnesses." *Blue*, 189 Ill. 2d at 137. "A prosecutor's remarks will be

grounds for reversal only when they result in substantial prejudice to the defendant." *People v. Desantiago*, 365 Ill. App. 3d 855, 866 (2006) (citing *People v. Sutton*, 353 Ill. App. 3d 487, 498 (2004)). Substantial prejudice occurs " 'if the improper remarks constituted a material factor in a defendant's conviction.' " *People v. Maldonado*, 402 Ill. App. 3d 411, 422 (2010) (quoting *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)).

¶ 211        Defendant has not shown how the prosecutor's objections were anything other than providing an evidentiary basis for the objection. *Blue*, 189 Ill. 2d at 136. The State was not introducing new evidence or contrary evidence, rather, it was explaining the objection by stating that defense counsel was incorrectly referencing past questions or sidebar conversations. Defendant relies primarily on *Blue,* 189 Ill. 2d 99; however, in that case the prosecutor, through his objections, accused witnesses of lying, introduced evidence that a warrant was out for a witness, and accused defense counsel of continually misstating the record. *Blue*, 189 Ill. 2d at 135-36. In the case at bar, nothing in the record rises to this level of misconduct. Unlike in *Blue*, we do not find that the prosecutor's conduct "exceeded the accepted evidentiary bases for entering objections." *Blue*, 189 Ill. 2d at 137. Thus, we cannot find that the prosecutor's remarks substantially prejudiced defendant. *Desantiago*, 365 Ill. App. 3d at 866.

¶ 212                    D. The State's Rebuttal Closing Argument

¶ 213        Defendant next claims that the State distorted the burden of proof during its rebuttal closing argument when it stated:

         "THE STATE: You know, folks, there's an old saying, country saying. It says when you get kicked by the horse the first time, it's the horses fault. When you get kicked the second time, it's your fault. Don't let anybody kick you into finding this

78

guy not guilty. *** Because for that to happen, you've got to believe that the evidence that was presented here was fabricated, incompetently handled, that there was perjury, and that the unluckiest man in the world sat over here and had a T-shirt found in his laundry."

¶ 214    We start by noting that it is not clear if a prosecutor's comments during closing arguments are reviewed *de novo* or for an abuse of discretion.  See *People v. Raymond*, 404 Ill. App. 3d 1028, 1059 (2010) (citing *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009), and *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008)). We do not need to spend time here discussing this distinction, which has been discussed many times before. Nor do we need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard.

¶ 215    When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007); *People v. Johnson*, 208 Ill. 2d 53, 113 (2003); *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004). A prosecutor has wide latitude during closing argument. *Wheeler*, 226 Ill. 2d at 123; *Blue*, 189 Ill. 2d at 127. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields ***." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).   Reversal is warranted only if the prosecutor's remarks created "substantial prejudice." *Wheeler*, 226 Ill. 2d at 123; *Johnson*, 208 Ill. 2d at 64; *People v. Easley*, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice.").

¶ 216        Defendant relies on *People v. Miller*, 302 Ill. App. 3d 487 (1998), in which the court held that "[f]or the prosecution to argue that in order to acquit the defendant the jury must believe that the State's witnesses are lying is a misstatement of law and a serious error which shifts the burden of proof." *Miller*, 302 Ill. App. 3d at 497 (citing *People v. Wilson*, 199 Ill. App. 3d 792, 797 (1990)). However, the *Miller* court noted:

> "For the prosecution to argue that, ' "in order to believe the defendant's version of the incident" ' [citation], the jury must believe that the State's witnesses are lying is usually a misstatement of the evidence and a less serious error. This is especially true if the testimony of the defense and prosecution witnesses is directly contradictory on matters concerning which they are not likely to be mistaken--that is, if under the circumstances of the case the statement is not substantially misleading. [Citation.]" *Miller*, 302 Ill. App. 3d at 497.

¶ 217        In *People v. Coleman*, 158 Ill. 2d 319 (1994), our supreme court found that the prosecutor stating " '[l]adies and gentlemen, in order to believe the Defendant you must believe that all the civilian witnesses, all the police, all the experts, lied' " during closing arguments did not lead to substantial prejudice against the defendant. *Coleman*, 158 Ill. 2d at 345, 347-48. Similarly, in the case at bar, when the State's comments are placed in context, it is clear that the State is referring to what the jury would have to find in order to believe defendant, not in order to find him not guilty. While the Prosecutor's "country saying" may not have made this as clear as desired, it was a version of "fool me once, shame on you, fool me twice, shame on me" which inherently refers to whether or not someone is believable. The fact that the State was referring to whether to believe defendant is made more evident because defense counsel explicitly stated in his closing that nearly every witness who told a

different version of events than told by defendant was lying. In doing so, he invited the comparison that to believe defendant the jury would have to believe that the minor, his grandmother, his father, Abruscato, Abruscato's lawyer, and the Lake County ASA were lying, and the prosecutor in his rebuttal was essentially reiterating the very same comments made by defense counsel. However, it is true that it was incorrect to say that to believe the defendant the jury would have to find that "every witness" was lying, as not every witness rebutted defendant's version of events. As such, while this did constitute a misstatement of the evidence, it was not such a serious error that it inherently denied defendant a fair trial. *Miller*, 302 Ill. App. 3d at 496-97.

¶ 218    We do not find in this instance, where both sides presented testimony that the witnesses for the other side were lying, and both sides argued during closing that their witnesses were more believable and the other side's were untruthful, that the comment made by the State created substantial prejudice against defendant. *Wheeler*, 226 Ill. 2d at 123.

¶ 219                               E. Cumulative Error

¶ 220    Defendant's final claim is that when all of these claims are looked at together, they constitute cumulative error resulting in prejudice that denied defendant his constitutionally protected right to present a complete defense and a fair trial. *Ramirez*, 2012 IL App (1st) 093504, ¶ 43. However, because we have not found any substantial merit in defendant's claims, we need not find if they cumulatively led to prejudice. See, *e.g.*, *People v. Perry,* 224 Ill. 2d 312, 356 (2007) (in rejecting each of defendant's claims, cumulative error analysis was not necessary).

¶ 221                              IV. Prior Consistent Statements

¶ 222          Defendant next claims that the trial court erred when it allowed the State to question

Kondrat during cross-examination in order to elicit prior consistent statements to rehabilitate

the credibility of the minor and Abruscato. Defense counsel did object to some of these

questions, but only stated that he was objecting because the questions were "beyond the

scope." Regardless, this issue was not included in the posttrial motion for a new trial. In order

to preserve an error, there must be an objection at trial and a posttrial motion raising the

issue. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant does not argue in his appellate

brief, or in his reply brief, that this issue is subject to plain-error review. "Our supreme court

has recently made [it] clear that a defendant who fails to argue for plain error review

'obviously cannot meet his burden of persuasion.' " *People v. McCoy*, 405 Ill. App. 3d 269,

273-74 (2010) (quoting *People v. Hillier*, 237 Ill. 2d 539, 545 (2010)). Specifically, " 'when a

defendant fails to present an argument on how either of the two prongs of the plain-error

doctrine is satisfied, he forfeits plain-error review.' "*McCoy,* 405 Ill. App. 3d at 274 (quoting

*Hillier*, 237 Ill. 2d at 545-46). Accordingly, we find that this issue was not properly

preserved for review by this court, and that defendant has forfeited plain-error review. *Enoch*,

122 Ill. 2d at 186; *McCoy,* 405 Ill. App. 3d at 274.

¶ 223                              V. Factors in Sentencing

¶ 224          Defendant next claims that the judge improperly considered that defendant caused or

threatened serious physical harm as a factor in sentencing defendant. Defendant agrees that

this issue was not included in his motion to reconsider sentence, but urges us to consider the

issue under plain-error review. *Piatkowski*, 225 Ill. 2d at 564. Again, before we can perform

plain-error analysis, we must first determine that any error occurred at all. *Piatkowski*, 225 Ill. 2d at 565.

¶ 225     A trial court's sentencing decisions are entitled to great deference and will not be disturbed on appeal absent an abuse of discretion. *People v. Spicer*, 379 Ill. App. 3d 441, 465 (2007) (quoting *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007)). " 'A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense.' " *Spicer*, 379 Ill. App. 3d at 465 (quoting *Jackson*, 375 Ill. App. 3d at 800).

¶ 226     In the case at bar, defendant was sentenced for 24 years for aggravated criminal sexual assault, a Class X felony with a sentencing maximum of 30 years. 720 ILCS 5/11-1.30(a)(4) (West 2010); 730 ILCS 5/5-4.5-25(a) (West 2010). The judge considered five factors in sentencing defendant, one of which was that defendant caused or threatened serious physical harm. From the record, we cannot conclude that considering this factor was an abuse of discretion. The record reveals that minor felt "pain" when defendant assaulted him. While the minor did not show physical symptoms when examined by Dr. Abujarma, she testified that given the time between the assault and the examination, this was not unexpected.

¶ 227     Even if this was an improper factor, we would not feel compelled to reverse the sentencing. A reviewing court need not reverse where a single improper consideration during sentencing was not the dominant factor considered. *People v. Steppan*, 105 Ill. 2d 310, 322-23 (1985); *Sims*, 403 Ill. App. 3d at 24. When the appellate court reviews a sentence, it "should not focus on a few words or statements made by the trial court, but must consider the record as a whole." *Sims,* 403 Ill. App. 3d at 24 (citing *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007)). In the case at bar, there were four other factors that were considered, and the

trial court did not state which were weighed more heavily in consideration of the sentencing. We note that "[t]he trial judge is not required to set forth each and every reason or specify the weight given each factor considered in the sentencing decision." *People v. Williams*, 223 Ill. App. 3d 692, 701 (1992) (citing *People v. Brajcki*, 150 Ill. App. 3d 506 (1986)). Unstated by the trial court, but plainly clear in the record, was also the psychological harm that the minor testified that he suffered, when minor testified during the sentencing hearing. The minor testified that he suffered depression, had trouble eating, concentrating in school, and maintaining healthy relationships with his peers. "[T]he trial court may consider the psychological impact of a sexual assault on the victim in determining an appropriate sentence." *Williams*, 223 Ill. App. 3d at 701.

¶ 228     As a result of the multiple factors considered by the trial court, and the psychological harm that the record reveals the minor suffered, we cannot find that the trial court abused its discretion when it sentenced defendant to a sentence that was well within the statutory range. *Spicer*, 379 Ill. App. 3d at 465.

¶ 229                              VI. Double Enhancement

¶ 230     Defendant next claims that his aggravated criminal sexual assault conviction must be vacated because the aggravated criminal sexual assault charges were based on the commission of criminal sexual assault during the felony of unlawful restraint. 720 ILCS 5/11-1.30(a)(4) (West 2010). Specifically, he argues that unlawful restraint is a lesser included offense of criminal sexual assault and using it to enhance criminal sexual assault to aggravated criminal sexual assault is a double enhancement. A double enhancement occurs when either: "(1) a single factor is used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed, or (2) the same factor

is used twice to elevate the severity of the offense itself." *People v. Guevara,* 216 Ill. 2d 533, 545 (2005) (citing *People v. Phelps,* 211 Ill. 2d 1, 11-13 (2004)). As this is a sentencing issue, we review it for abuse of discretion. *Spicer*, 379 Ill. App. 3d at 465.

¶ 231      A person commits unlawful restraint when he "knowingly without legal authority detains another." 720 ILCS 5/10-3 (West 2010). While defendant maintains that unlawful restraint is a lesser included offense of criminal sexual assault, Illinois courts have held "[u]nlawful restraint is not necessarily a lesser included offense of criminal sexual assault." *People v. Alvarado*, 235 Ill. App. 3d 116, 117 (1992). "In determining whether a defendant committed a separate physical act of unlawful restraint, Illinois courts have looked at whether the restraint was 'independent' of the physical act underlying the other offense [citations]." *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 51. "The evidence must, however, show that the restraint was independent of the other offense and punishable as such." *People v. Sperow*, 170 Ill. App. 3d 800, 814 (1988) (citing *People v. Kuykendall*, 108 Ill. App. 3d 708, 711 (1982)).

¶ 232      Defendant relies primarily on *People v. Brials*, 315 Ill. App. 3d 162 (2000). In *Brials*, the unlawful restraint that was used to enhance criminal sexual assault to aggravated criminal sexual assault was the actual restraint used to prevent the victim from moving during the sexual assault. *Brials*, 315 Ill. App. 3d at 175. In the case at bar, the unlawful restraint that was used as an enhancing factor was not the restraint used by defendant to perpetrate the sexual assault. Instead, the unlawful restraint occurred when the minor had previously attempted to leave the apartment and defendant slammed the door shut and locked it. The sexual assault did not even occur immediately following the unlawful restraint, as the time between the restraint and the assault were separated by the time defendant spent in the

bathroom with the minor. This was not a case in which the unlawful restraint being charged was inherent to the crime itself, as defendant could have held the minor down and sexually assaulted him without first locking him in the apartment and then forcing the minor to "model" a jockstrap. In this sequence of events, the unlawful restraint by confining the minor in the apartment was independent from the sexual assault and punishable as such. *Sperow*, 170 Ill. App. 3d at 814. We cannot find that the trial court abused its discretion when it used the unlawful restraint to enhance criminal sexual assault to aggravated sexual assault.

¶ 233                     VII. One-Act, One-Crime

¶ 234        Defendant finally claims that under the one-act, one-crime rule articulated in *People v. King*, 66 Ill. 2d 551, 566 (1977), his convictions for criminal sexual assault and unlawful restraint should be vacated, as they all resulted from the same act of sexual penetration with the minor. We have just found that the unlawful restraint was a separate and independent act from the sexual assault, so we cannot find that this resulted from the same act and therefore do not vacate that conviction. However, the conviction for criminal sexual assault requires further discussion.

¶ 235        Whether defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law that this court reviews *de novo*. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010); *People v. Artis*, 232 Ill. 2d 156, 161 (2009); *People v. Kolton*, 219 Ill. 2d 353, 361 (2006). *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)). While defendant did not raise this issue in the trial court or his posttrial motions, our supreme court has held that any forfeited one-act, one-crime arguments may be evaluated by a reviewing court under the second prong

of the plain-error rule because they implicate the integrity of the judicial process. *Nunez*, 236 Ill. 2d at 493 (citing *Artis*, 232 Ill. 2d at 167-68).

¶ 236    The one-act, one-crime rule holds that multiple convictions are improper if they result from the same act. *People v. Miller*, 238 Ill. 2d 161, 165 (2010). "If an offense is a lesser-included offense, multiple convictions are improper." *Miller,* 238 Ill. 2d at 165 (citing *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996)). Criminal sexual assault requires sexual penetration, and aggravated criminal sexual assault requires criminal sexual assault. 720 ILCS 5/11-1.20(a), 11-1.30(a) (West 2010). Defendant only sexually penetrated minor one time at his apartment, so it is clear that the criminal sexual assault defendant was convicted of was a lesser-included offense of the aggravated criminal sexual assault, both resulting from the same act of penetration. As such, it was improper to convict defendant for criminal sexual assault. *Miller,* 238 Ill. 2d at 165. We thereby vacate the conviction for criminal sexual assault and correct the mittimus to reflect only the convictions of aggravated criminal sexual assault and unlawful restraint. *People v. Mitchell*, 234 Ill. App. 3d 912, 921 (1992) ("[T]his court may court may correct the mittimus without remanding to the trial court.").

¶ 237                                             CONCLUSION

¶ 238    For the foregoing reasons, we do not find convincing defendant's claims that: (1) he was denied the ability to present a complete defense; (2) the trial court's prejudice denied him a fair trial; (3) prosecutorial misconduct denied him a fair trial; (4) the trial court erred in allowing the State to rehabilitate witnesses with prior consistent statements; (5) the trial court considered improper aggravating factors during sentencing; and (6) defendant's aggravated criminal sexual assault is the result of a double enhancement.

¶ 239    However, we do find convincing defendant's claim that the trial court erred in not vacating the conviction for criminal sexual assault. We affirm, and correct the mittimus to reflect only convictions for aggravated criminal sexual assault and unlawful restraint

¶ 240    Affirmed; mittimus corrected.